**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

_____

RICK POOLAW, CINDY POOLAW, and CHARA
POOLAW,

            Plaintiffs,

v.                                            No. CIV 06-923 BB/WDS

DARREN WHITE, GREG MARCANTEL, and
TIMOTHY HIX, in their individual capacities,
and BERNALILLO COUNTY BOARD OF
COMMISSIONERS,

            Defendants.


**<u>MEMORANDUM OPINION AND ORDER</u>**

       THIS MATTER comes before the Court for consideration of cross-motions for partial summary judgment filed by Plaintiffs (Doc. 23) and by Defendants (Doc. 29).  The Court has reviewed the submissions of the parties and the relevant law.  For the reasons set forth below, the Court finds that Plaintiffs' motion will be granted, and the motion filed by the City Defendants will be denied in part, and granted to the extent Plaintiffs concede a portion of their claims.

       This case arises out of an extensive manhunt that occurred following the murder of Bernalillo County Sheriff's Deputy James McGrane in the early morning hours of March 22, 2006.  The suspect in that killing was Michael Astorga.  At the time of the killing, Astorga was married to a daughter of Plaintiffs Rick and Cindy Poolaw ("the Poolaws" or "Rick" or "Cindy"), named Marcella (sometimes referred to in the pleadings as "Nicole" or "Nicki").  Marcella was a few months' pregnant at the time of the McGrane murder.  Two days after the murder, the Bernalillo County Sheriff's Department executed a search warrant at property owned by Rick and Cindy.  The search covered their residence, a mobile home parked on their property that was inhabited by another daughter of the Poolaws, Plaintiff Chara Poolaw ("Chara"), and a tool shed located on the property.  The purpose of this search was to

discover either Astorga himself, unspecified evidence of the McGrane homicide, or unspecified evidence of a different homicide that had occurred five months earlier and was the ostensible motive for the murder of Deputy McGrane. During the search Rick, a retired twenty-five year veteran of the New Mexico State Police, and Cindy were both handcuffed for a period of time. Four days after the search warrant was executed on the property belonging to Rick and Cindy, Chara was stopped by officers while she was driving a vehicle, and a search of her vehicle ensued.

Plaintiffs subsequently filed this lawsuit, claiming there was no probable cause for the issuance of the search warrant covering their property, and significant information negating any possibility of probable cause was omitted from the affidavit supporting the search warrant. Rick and Cindy maintain in addition that their detention was unconstitutional because they were held in handcuffs for an unreasonably lengthy period of time. As a separate claim, Chara contends there was no reasonable suspicion or probable cause supporting the stop of her vehicle, and her consent to search the vehicle following the stop was a product of coercion. Both Plaintiffs and Defendants have moved for partial summary judgment on these issues, and the individual Defendants have in addition maintained they are entitled to qualified immunity as a matter of law even if a constitutional violation did occur during one or both of the detentions and searches.

**Standard of Review:**  Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, a court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Serv.*, 165 F.3d 1321, 1326 (10th Cir. 1999). A mere scintilla of evidence supporting the nonmoving party's theory does not create a genuine issue of material fact. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir. 1999). Instead, the nonmoving party must present facts such that under the applicable law, a reasonable jury

2

could find in its favor.  *Id*.  The Court will analyze the motions for partial summary judgment under this standard.

**Discussion**

**Search Warrant for Residence and Property Belonging to Rick and Cindy:**  "Generally, the Fourth Amendment prohibits a search of a residence unless it is pursuant to a search warrant supported by probable cause."  *U.S. v. Tucker*, 305 F.3d 1193, 1199 (10th Cir. 2002).  A person's home is the most important location protected by the Fourth Amendment, which makes the probable cause requirement especially significant in cases involving the entry and search of a home by law enforcement officers.  *See, e.g., Wilson v. Layne*, 526 U.S. 603, 610 (1999) (noting the "centuries-old principle of respect for the privacy of the home."); *Payton v. New York*, 445 U.S. 573, 585 (1980) (entry of the home is the "chief evil" against which the Fourth Amendment is directed).  In arguing that the search warrant in this case was either supported or not supported by probable cause, both parties have referred to facts that were not included in the search-warrant affidavit.[1]  These additional facts, however, are not properly considered in determining whether the search warrant was based on adequate probable cause.  Instead, the Court is limited to examining the facts contained in the search-warrant affidavit, as those are the only facts that were considered by the authority issuing the warrant.  *See U.S. v. Tuter*, 240 F.3d 1292, 1298 (10th Cir. 2001) (in passing on the validity of a warrant, the reviewing court may consider only information that was brought to the magistrate's attention).

Defendant Hix submitted the affidavit in support of the request for search warrant.  In that affidavit, he included certain facts concerning Marcella, the homicide suspect Astorga, and the Poolaws'

---

[1]For example, Defendants claim that Marcella "had lived with or spent significant time at the Poolaws' property during the time period between the Martinez and McGrane homicides" and that Marcella was living at least part-time in the Poolaw residence "in her own room" shortly before and at the time of the McGrane homicide.  For their part, Plaintiffs point out that Astorga "never stayed at the Poolaw home" overnight; that he had not even been inside their home since shortly after he married Marcella in August 2005; and that he was not welcome in the home.  None of these "facts" was included in the search-warrant affidavit, although, as discussed below, the affiant did speculate that Marcella lived with the Poolaws "at least part time."

property, as well as certain inferences and assumptions that he based on those facts.  The only relevant facts contained in the affidavit were the following, with especially significant facts emphasized:  (1) An employee of a convenience store, which is located on the same highway as the Deputy McGrane homicide crime scene, pointed out **a "nearby residence located at #31 Lark Rd that Mr. Michael Paul Astorga recently moved into"**; (2)  A canvass of neighbors of that residence indicated **a male matching Astorga's description moved into that residence with his "pregnant girlfriend" several weeks before the Deputy McGrane homicide**; (3) **The vehicle involved in the traffic stop that led to the killing of Deputy McGrane was found parked in that same area**; (4) When Astorga had been arrested previously, he listed Marcella Astorga as his spouse and emergency contact; (5) Marcella was pregnant at the time of the homicide; (6) Defendant Bernalillo County Sheriff's Lieutenant Greg Marcantel recognized Marcella's name and telephoned Plaintiff Rick Poolaw at 8:30 a.m. on the morning of the murder; (7) Rick advised Marcantel that when he left home that morning, Marcella was awake and getting ready to go to work; (8) Marcella did not in fact go to work that day but instead called in sick, which Rick said was unusual; (9) at 1:30 in the afternoon, following efforts by Chara and Rick to find Marcella,  Rick contacted Marcantel and said he had found her, and as a result detectives were able to meet with her; (10) Marcella confirmed to the detectives that she was pregnant with Astorga's baby **and that they recently moved into the residence at #31 Lark Road**; (11) Marcella provided detectives the keys to the residence and a sketch of the floor plan; and (12) The Poolaws' residence was currently under surveillance by law enforcement personnel, and would remain under such surveillance until the search warrant could be executed.

From these facts, Defendant Hix made the following inferences and assumptions and included them in the search-warrant affidavit:  (1) Marcella lives at least part-time at the Poolaws' Calle Del Banco residence; (2) "Based on the apparent fact that Marcella Poolaw (Astorga) resides at least part time at 343 Calle Del Banco ... it would be reasonable to assume that her husband, Michael Astorga, resides there at least part time as well and may have left or hidden evidence related to this

crime at this residence."; (3) It is also reasonable to assume that Astorga may have secreted himself or any evidence within any of the structures on the property.  These assumptions are the heart of the search-warrant affidavit, and the reason the warrant was obtained; Hix claimed to the issuing judge that there was probable cause to believe either Astorga, or evidence he had hidden, was located somewhere on the Poolaws' property.

The problem with the assumptions made by Hix and, apparently, the issuing judge, is that there are insufficient facts in the affidavit to support those assumptions and, in some cases, there are facts directly contradicting them.  First, as to how often Marcella stayed at the Poolaws' residence, the only fact in the affidavit is that she stayed there on the night of the Deputy McGrane homicide; there are no facts indicating how often she did this or to support Hix's assertion that she actually did live with her parents on a part-time basis.[2]  More importantly, the only facts in the affidavit indicating where Astorga lived with Marcella show that they lived together at #31 Lark Road, a location nowhere near the Poolaws' property in Bernalillo.[3]  There are no facts indicating Astorga was ever seen at the Poolaws' property with Marcella, had ever stayed there overnight, or had ever visited the property at any time in the days, weeks, or months preceding the killing of Deputy McGrane.  Significantly, despite the fact the Poolaws' property was under surveillance, this surveillance had apparently uncovered no sign that Astorga might be somewhere on the property--for example, there was no indication in the affidavit that any of the residents of the Poolaw property were acting in a suspicious manner or that any furtive movements had been seen in any of the structures on the property.  Furthermore, when interviewed by detectives, Marcella turned over the keys to the Lark Road residence and drew the floorplan of that

---

[2]In fact, Marcella did stay with her parents regularly when she was separated from Astorga, which was apparently a frequent occurrence.  However, the affidavit does not contain these facts and, as noted above, they may not be considered in the probable-cause analysis.  If they were so considered, the fact that she only stayed with her parents when she was not with Astorga would cut against, not in favor of, a finding of probable cause.

[3]The Court takes judicial notice of the location of Bernalillo, New Mexico, and the East Mountains area where the Deputy McGrane homicide occurred and Lark Road is located.

residence, thus allowing law enforcement officers easy access to the premises, and there is nothing in the affidavit that can be construed as an indication that Marcella was hiding any information or evidence concerning the killing of Deputy McGrane or any other crime. In sum, the affidavit contains no facts providing any reason to believe that Astorga, or evidence of a crime he might have committed, might be found on the Poolaws' property.

Defendants disagree with this conclusion, making the following arguments. First, Marcella had contact with Astorga during the five-month period between the prior murder and the killing of Deputy McGrane, and Astorga could have given her evidence relevant to the prior murder during that time. Second, Astorga's desire to escape capture for the prior murder was his motive for shooting Deputy McGrane, so any evidence relevant to that prior murder was also relevant to the case involving the deputy's homicide. Also, law enforcement officers are trained to know that fugitives often run to family to find shelter or assistance, so it is likely Astorga would go to the Poolaws' property to be with his wife. Finally, Marcella could not be located for several hours during the morning after Deputy McGrane was killed, and during that time she could have met with Astorga and he could have given her evidence related to the shooting. As discussed below, however, these arguments are based on possibilities and assumptions rather than facts.

Defendants specify no evidence concerning the prior homicide that might have been given to Marcella, and nothing in the search-warrant affidavit provides any indication she was given such evidence. This argument, therefore, is based purely on speculation.[4] Similarly, the argument that

---

[4]Plaintiffs contend that any information concerning evidence of a five-month-old homicide was likely stale as a matter of law, and could not be the basis for probable cause to search the Poolaws' residence. Defendants did not specify any evidence they thought might be on the premises, and the Court therefore cannot address the staleness issue, as the Court does not know whether the evidence is of a type that is likely to degrade over time, or be moved, or be permanently hidden in a certain location. *U.S. v. Cantu*, 405 F.3d 1173, 1177 (10th Cir. 2005) (whether the information is too stale to establish probable cause depends on, *inter alia*, the nature of the property to be seized); 2 Wayne R. LaFave, *Search and Seizure* § 3.7(a), p. 383 (4th ed. 2004) (where crime under investigation is a prior murder and not a continuing offense, most important factor in staleness analysis is nature of the property that is sought). In any event, the Court need not decide that issue in this opinion.

Marcella might have met with Astorga the morning after Deputy McGrane was killed, and that Astorga might have given her evidence relevant to that shooting, is double speculation, as there are no facts supporting either proposition.  The remaining argument, that law enforcement officers are trained to know that fugitives will run to family members to hide and obtain assistance, is based on a fact (law enforcement officers' training) that was not presented in the search-warrant affidavit and therefore was not known by the issuing judge.[5]  Even if it is considered, however, since Marcella was not staying in her own home but with her parents, the possibility that Astorga would run to her at her parents' house remains just that, a possibility, without further facts indicating Marcella's parents might be sympathetic to Astorga's plight and try to protect him.  The only inference that can be drawn from the facts in the affidavit, however, is that both Rick and Marcella were helping law enforcement rather than trying to hinder their efforts – Rick went out of his way to find Marcella and afford detectives an opportunity to interview her, and there is no indication she balked in any way before providing the key to the Lark Road residence as well as other information.

When all of the extraneous matter is removed, this case boils down to the fact that the warrant authorizing a search of the Poolaws' residence was issued because their daughter was married to Astorga, she stayed overnight at their house and did not go to work the next morning, and Astorga was on the run.  The warrant was issued even though surveillance of the Poolaws' residence apparently revealed nothing untoward, the Poolaws were cooperating with law enforcement rather than being obstructive, and there were no facts indicating Astorga had ever given Marcella anything or had ever been on the Poolaws' property.  The Court is mindful of the need to give great deference to the judge issuing the search warrant, but the Court cannot defer if there is no substantial basis for concluding that

_____

[5]In fairness, if the law enforcement officers' training should enter into the probable-cause calculus, so should the fact that Astorga's father-in-law, Rick, was a twenty-five year veteran of the New Mexico state police.  This would logically make it much less likely that someone who had just killed a law enforcement officer would run to the in-laws' residence for shelter and assistance.  As discussed above, however, these facts do not enter into the Court's determination of probable cause, as they were not included in the search-warrant affidavit.

probable cause existed.  *U.S. v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000).  In this case, the

only real basis for the probable-cause determination was the marital relationship between the Poolaws'

daughter and Astorga.  However, a close familial relationship is not enough, standing alone, to provide

probable cause; there must also be facts establishing a nexus between the person or items sought and

the location specified in the search warrant.  *See, e.g., Walczyk v. Rio*, ___ F.3d ___, 2007 WL

2199005 (2d Cir. 2007) (even though son lived across the street from his mother, and there was

probable cause to believe he possessed firearms at his residence, that probable cause did not extend to

his mother's residence because he had not lived there for seven years; omission of this fact from the

search-warrant affidavit obviated the determination of probable cause made by the magistrate and

rendered the search of the mother's residence unconstitutional); *United States v. Herron*, 215 F.3d 812,

814-15 (8th Cir. 2000) (no probable cause to search defendant's farm merely because police found

marijuana on the farm of defendant's relative, and relative had stayed at defendant's farm previously);

*United States v. Jones*, 641 F.2d 425, 428 (6th Cir. 1981) (arrest warrant for defendant did not provide

probable cause to search home of defendant's brother's girlfriend when male answered door).[6]

     Here, where the close familial relationship was not between the owners of the property to be

searched, the Poolaws, and the object of the search, but was between their daughter and Astorga, there

was even more need for facts connecting Astorga to the Poolaws' property.  Instead, as discussed above,

the search-warrant affidavit provided only inferences and assumptions of dubious reliability – that

Marcella lived with the Poolaws at least part-time because she had stayed there the night of the Deputy

McGrane murder, that Astorga must also live there at least part-time because Marcella did, and that

---

    [6]The Court notes that in every case allowing the search of a home other than the suspect's, the
court deciding the case takes pains to point out facts directly connecting the suspect's activities to the
premises searched.  *See, e.g., United States v. Cook*, 1991 WL 270730 (9th Cir. 1991 unpublished)
(search of suspect's parents was justified because there were facts linking the parents to the suspect's
activities, as well as the suspect's use of his parents' residence to receive mail relevant to his money-
laundering activities); *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1567 (9th Cir. 1989)
(noting that suspect had recently been observed visiting his wife and daughter at their home, thus
justifying a search of the home for evidence of suspect's ongoing criminal activities).

Astorga may have given Marcella evidence regarding either the homicide five months earlier or the shooting of Deputy McGrane.  A court may not "arrive at probable cause simply by piling hunch upon hunch." *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004).  That, however, is exactly what occurred in this case.

The Court recognizes that Astorga was suspected of killing two men, one of them a law enforcement officer, and that Defendants were under great pressure to find him quickly.  Even in an emergency situation, however, the requirements of the Fourth Amendment must be met, although they may be less stringently applied.  *See, e.g., Llaguno v. Mingey*, 763 F.2d 1560, 1565 (7th Cir. 1985) (the fact that a multiple murderer is on the loose does not give the police a license to search and seize without a reasonable basis, but it may affect the judgment of what is reasonable), *abrogated on other grounds*, *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).  Furthermore, it should be noted that the urgency of the need to search the Poolaws' property was considerably lessened by the facts that the search took place two days after the crime in question, the property had been and remained under surveillance, and Rick, Chara, and Marcella had all cooperated with law enforcement officials.  Despite the situation facing Defendants in this case, their assumptions and speculations were simply not enough to provide probable cause to violate the Poolaws' right of privacy in their home.[7]

**Qualified Immunity for the Search:**  The individual Defendants maintain they are entitled to qualified immunity even if probable cause did not exist to support issuance and execution of the

---

[7]Due to this holding, the Court need not address Plaintiff's claim that the omission of significant information from the search-warrant affidavit vitiated any probable cause that might otherwise have existed.  The Court does note that Rick Poolaw's status as a former state police officer would appear to be significant, as it greatly lessens the likelihood that Astorga would run to Rick's residence for shelter or assistance.  In addition, the Court need not address the question of the reasonableness of the detention of Rick and Cindy in handcuffs during the search; since the search was not supported by probable cause, any detention at all was *ipso facto* unreasonable.  If the Court were required to address the issue, summary judgment would not be granted to either side; given the disputed facts presented by the parties, the reasonableness of the manner in which the Poolaws were detained would be a question for the jury.  *See, e.g., Stuart v. Jackson,* 24 Fed.Appx. 943 (10th Cir. 2001, unpublished) (where plaintiffs handcuffed during search, jury could find handcuffing was not constitutionally reasonable).

search warrant.  Where the issue is whether there was probable cause to arrest or to issue a search warrant, a law enforcement officer is entitled to qualified immunity if there was "arguable probable cause" supporting the action.  *See, e.g., Walczyk, supra*, 2007 WL 2199005, **16-17.  Furthermore, although the issue of qualified immunity is often an issue for the jury, where the facts surrounding the issue are undisputed the question of "arguable probable cause" is one for the court.  *See Cortez v. McCauley*, 478 F.3d 1108, 1120-21 (10th Cir. 2007) (where parties agree on the facts, for qualified immunity purposes, the officers' conduct was either objectively reasonable under existing law or it was not, and that is a legal question).  In this case, since the only facts that matter are those contained in the search-warrant affidavit, the facts are undisputed and the Court will decide the qualified-immunity question as a matter of law.

Based on the discussion in the preceding section, the Court finds the issue of probable cause was not even arguable.  The Court has already pointed out that there were no facts establishing a nexus between the Poolaws' property and Astorga, other than the fact that their daughter was staying with them rather than in the home she shared with Astorga.  The possibility that Astorga might have given Marcella evidence to hide was, as noted above, pure speculation.  As one scholar has noted, "[i]f there is one bright star in the Fourth Amendment heaven, it is that probable cause must be shown on the basis of facts rather than mere conclusions."  2 LaFave *Search and Seizure* § 3.2(d), p. 64 (4th Ed. 2004).  It was incumbent on Defendants to develop more facts, through the surveillance of the residence, by interviewing the Poolaws and their daughters again, or by other means, to support even arguable probable cause.  *See Cortez, supra*, 478 F.3d at 1121 (finding there was no arguable probable cause that might warrant grant of qualified immunity, and pointing out that if there is only enough evidence for suspicion rather than probable cause, additional investigation may well be necessary in order to establish probable cause).[8]   The requirement of providing facts, rather than mere assumptions, to

---

[8]The Court's refusal to grant the individual Defendants qualified immunity is strengthened by the affidavit's omission of a highly salient fact, Rick's prior service as a New Mexico state police

establish probable cause was well-established.  *See Anderson v. Blake*, 469 F.3d 910, 917 (10th Cir.

2006) (for qualified immunity purposes, courts do not require "precise factual correspondence" between

the cases establishing the law and the case at hand).  Summary judgment will be granted denying the

individual Defendants' request for qualified immunity.

     **Stop and Search of Chara Poolaw's Vehicle:**  The facts surrounding the stop of Chara's

vehicle are simple and straightforward.  Law enforcement officers had obtained a court order allowing

a wiretap of Cindy Poolaw's cell phone.[9]  On March 28, four days after the Poolaws' residence and

property had been searched, Chara left her workplace to buy lunch for herself and for some co-workers.

As she drove back toward her workplace she telephoned her mother and asked if she could get in trouble

for having a gun in her car.  When Defendant Marcantel was told about this conversation, he ordered

"resources" to stop Chara's vehicle to determine whether the gun might be the gun Astorga had

allegedly used to shoot Deputy McGrane.  This stop did occur, and Chara subsequently signed a consent

to search under circumstances that are disputed.  The parties also dispute whether a search of Chara's

vehicle was performed even before she signed the consent form.  The only question the Court addresses

in this opinion is whether there was a constitutional basis for the stop of Chara's vehicle; the Court finds

there was none.

     A stop of a vehicle must be supported by "probable cause, or at least articulable reasonable

suspicion, that there has been a criminal violation or that there is evidence of criminal activity in the

vehicle."  *United States v. Herrera*, 444 F.3d 1238, 1242 (10th Cir.2006).  The suspicion in this case,

according to Defendant Marcantel, was provided by the facts that Chara is Marcella's sister, Marcella

is married to Astorga, and Chara asked her mother if she could get in trouble for having a gun in the car.

---

officer.  This omission is at least some indication that the desire to obtain a search warrant outweighed
Defendants' willingness to provide information to the issuing judge that might undercut Defendants'
theory that Astorga might be hiding on the Poolaws' property.

     [9]The validity of the wiretap order is not an issue in this case.

[Pltf. MSJ Exh. 3 and Def. Resp. Exh. C, Marcantel dep., pp. 82, 87]  Significantly, Marcantel did not understand Chara to have said that she had "the" gun in the car, or "Astorga's" gun in the car, or "his" gun in the car; she said she had "a" gun in the car.  Also significantly, Marcantel knew that, consistent with Rick's law enforcement career, the Poolaws legally owned several firearms, as these guns had been discovered during the search of the Poolaws' residence four days earlier.  [*Id.* p. 87][10]  Finally, Marcantel pointed to nothing that had occurred during the previous four to six days that might have made him believe Chara was assisting Astorga in any way or had had any contact with him, and in fact knew that Chara had helped Rick find Marcella when the detectives were first looking for her.  [*Id., passim*]

      The Court finds the above undisputed facts do not rise to the level of reasonable suspicion that Chara was committing a criminal violation or that the gun in her car belonged to Astorga.  As the Court discussed with respect to the search of the Poolaws' home, Chara's mere status as Astorga's in-law does not, standing alone, give rise to an inference that she was helping him in any way, or had been in contact with him before or after the McGrane homicide.  The surveillance of the Poolaws' property, which included the mobile home Chara was living in, had apparently not revealed any suspicious behavior on the part of Chara or anyone living on the property.  Furthermore, the wiretap of Cindy's cell phone had also apparently not provided any indication that Chara might have access to Astorga or to his gun.  Again, therefore, the only bases for the stop of Chara's vehicle were her relationship to Astorga's wife and the fact that she said she had a gun in her car.  Absent some facts that might connect the gun in Chara's vehicle to Astorga, reasonable suspicion to support the stop of her vehicle simply was not present.

---

      [10]Plaintiffs point to the fact that Chara had the gun in her car the day after the shooting, and that a law enforcement officer had already seen the gun on that day and knew it was not Astorga's.  [Pltf. MSJ Exh. 10, Tafoya dep. pp. 15-17]  If Marcantel had known this information, the Court agrees it would vitiate any slight possibility that reasonable suspicion existed to stop Chara's vehicle.  However, there is no evidence this information was communicated to Marcantel, the person ordering the stop of the vehicle.  Therefore, the Court has not considered this information in reaching its decision.

In addition, the absence of such facts requires rejection of Marcantel's claim of qualified immunity.  Defendants argue that there is no law prohibiting a homicide investigator from ordering a stop of a person if the investigator reasonably concludes the person may be in possession of the murder weapon.  That, however, is precisely the point – it was not reasonable to conclude that the gun referred to by Chara might be the murder weapon, when Marcantel knew the Poolaws possessed firearms, knew there were no facts indicating Astorga had been in contact with Chara, Marcella, or the Poolaws, and knew Chara had been cooperative with detectives rather than evasive or obstructive.   Therefore, Marcantel is not entitled to qualified immunity with respect to the stop and subsequent search of Chara's vehicle.  *See Humphrey v. Mabry*, 482 F.3d 840, 850 (6th Cir. 2007) (for purposes of qualified immunity, question for officer who directed other officers to stop vehicle was whether an officer in his situation could have reasonably believed that the stop was  lawful).

**Municipal Liability Claims and Supervisory Claims Against Darren White:**  In response to Defendants' motion for partial summary judgment, Plaintiffs have agreed to dismiss Counts IV and V of their complaint and to dismiss Defendants Darren White and the Bernalillo County Board of Commissioners from this case.  Defendants' motion for summary judgment will therefore be granted to that extent.

**Conclusion**

Based on the foregoing, the Court holds there was no constitutional basis for either the search warrant authorizing the search of the Poolaws' residence and property, or for the stop of Chara's vehicle.  Plaintiffs' motion for partial summary judgment on those issues will therefore be granted.  In addition, Defendants' claims of qualified immunity will be denied.  The Court is sympathetic to the fact that law enforcement officers urgently wanted to locate and arrest Astorga; however, the Poolaws and Chara were still entitled to be secure in their home and vehicle until there were actual facts justifying the intervention of law enforcement officials into their privacy.

**ORDER**

A Memorandum Opinion having been entered in this case, it is ORDERED that Plaintiffs'

motion for partial summary judgment (Doc. 23) be, and hereby is, GRANTED, and that Defendants'

motion for partial summary judgment (Doc. 29) be, and hereby is, GRANTED in part and DENIED

in part.

Dated this 26th day of September, 2007.


_____
BRUCE D. BLACK
United States District Judge