**FILED**
**United States Court of Appeals**
**Tenth Circuit**

UNITED STATES COURT OF APPEALS

**July 24, 2009**

TENTH CIRCUIT

**Elisabeth A. Shumaker**
**Clerk of Court**

---

RICK POOLAW; CINDY
POOLAW; and CHARA POOLAW,

Plaintiffs-Appellees,

v.

GREGG MARCANTEL and
TIMOTHY HIX, in their individual
capacities,

Defendants-Appellants.

No. 07-2254
(D.C. No. 06-0923 BB/WDS)
(D.N.M.)

---

## ORDER

---

Before **LUCERO**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

---

This matter is before the court on the Petition for Rehearing En Banc

filed by Gregg Marcantel and Timothy Hix, Defendants-Appellants.  The

Court sua sponte grants panel rehearing for the limited purpose of adding

footnote 12 on page 22, which states:

> In a petition for rehearing, appellants argue that "[t]he
> majority's failure to apply the <u>Leon</u> 'good faith' exception to
> this case, and its refusal to grant immunity to the Defendants on
> that basis, leaves open an important question."  Appellants fail
> to note that they neither raised this potentially meritorious issue
> at the trial court level nor did they brief or argue it to this panel.
> Because of this failure, we do not consider the issue.  <u>See</u>
> <u>Oliveros v. Mitchell</u>, 449 F.3d 1091, 1095 (10th Cir. 2006)

(issues not raised before the district court are waived); <u>Becker v. Kroll</u>, 494 F.3d 904, 913 n.6 (10th Cir. 2007) (issues not raised in opening appellate brief are waived).

A copy of the amended opinion is attached, filed nunc pro tunc to May 4, 2009. A separate order will be entered regarding the Petition for Rehearing En Banc.

Entered for the Court,

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

May 4, 2009

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENNTH CIRCUIT

---

RICK POOLAW; CINDY
POOLAW; and CHARA POOLAW,

       Plaintiffs-Appellees,

v.

GREGG MARCANTEL and
TIMOTHY HIX, in their individual
capacities,

       Defendants-Appellants.

No. 07-2254

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-06-0923 BB/WDS)**

---

William D. Slease (Jonlyn M. Martinez with him on the briefs), Slease &
Martinez, P.A., Albuquerque, New Mexico, for the Defendants–Appellants.

George L. Bach, Jr. (Jane Gagne and Philip B. Davis with him on the briefs),
ACLU of New Mexico, Albuquerque, New Mexico, for the
Plaintiffs–Appellees.

---

Before **LUCERO**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

This case requires us to address the extent to which a familial connection to a suspect supports either probable cause for a search warrant or reasonable suspicion for an investigative detention. Following the murder of Bernalillo County Sheriff's Deputy James McGrane, Lieutenant Gregg Marcantel and Detective Timothy Hix obtained a warrant and ordered the search of property belonging to Rick and Cindy Poolaw, the parents-in-law of the primary suspect, Michael Paul Astorga. Marcantel later ordered the stop of Chara Poolaw, Astorga's sister-in-law. The search and stop were based on little more than the Poolaws' status as Astorga's in-laws.

Although we are sympathetic to the urgency of the officers' search for Astorga, we conclude that these actions violated the Fourth Amendment. Adhering to established Supreme Court precedent and the unanimous case law of this and other courts, we hold that a familial relationship is insufficiently particularized to justify invading an individual's reasonable expectation of privacy. Applying this rule to the present case, we conclude that the Poolaws' status as Astorga's in-laws, combined with the meager additional facts known to Marcantel and Hix, were insufficient to support a finding of either probable cause to search the property or reasonable suspicion to detain Chara.[1] Further, because these Fourth Amendment

---

[1] Because many of the individuals involved in this case share the name Poolaw, we will refer to Rick, Cindy, Chara, and Marcella by their first

(continued...)

principles were clearly established at the time of their actions, Marcantel and Hix are not entitled to qualified immunity.  We have jurisdiction under 28 U.S.C. § 1291, <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 530 (1985), and we affirm.

**I**

**A**

In the early hours of March 22, 2006, Bernalillo County Sheriff's Deputy James McGrane was shot and killed while conducting a traffic stop. Bernalillo County Sheriff's Office ("BCSO") investigators determined that the truck Deputy McGrane had stopped belonged to Astorga, who was also wanted in connection with the November 2005 homicide of Candido Martinez.  Based on this information, the investigators identified Astorga as the primary suspect in the McGrane homicide, and a manhunt ensued.

BCSO investigators discovered that Astorga had been in the area of the McGrane homicide on the night in question and that he lived at #31 Lark Road, approximately fifteen miles south of where McGrane was killed. Neighbors of #31 Lark Road told investigators that a man matching Astorga's description had recently moved in with his "pregnant girlfriend." Upon canvassing the area, officers also found the vehicle Deputy McGrane

---

[1](...continued)
names.  In the record, Marcella is also referred to as Marcella Poolaw Astorga, Marcella Astorga, Marcella Poolaw, Nicole, Nicki, and Nikki.

had stopped the night he was killed parked in the vicinity of Astorga's

address.

Investigators then sought out Marcella because Astorga had listed her

as his spouse and emergency contact when he had been arrested in the past.

After detectives failed to locate Marcella at her known address, Lieutenant

Marcantel telephoned Rick, a retired New Mexico State Police officer and

acquaintance.  Rick confirmed that Marcella was his daughter and that she

was pregnant by Astorga.  He also told Marcantel that she had spent the

night of March 21 at Rick and Cindy's home.  Throughout the day, Rick

called Marcantel to tell him that Marcella was no longer at the house, that

she had uncharacteristically called in sick to work, and, then, that he had

ultimately located her.

At the time of the investigation, Rick lived at 343 Calle Del Banco

with Cindy and their daughter Chara.[2]  Two days after the McGrane

homicide, Astorga remained at large.  BCSO investigators, including

Marcantel and Hix, decided that the Poolaws' property should be searched.

Hix prepared an affidavit seeking a warrant to search the Poolaws' property

("the Hix affidavit"), in which he provided a general description of the

---

[2] In their complaint, the Poolaws noted that at the time of the search
Chara lived at a separate address behind Rick and Cindy's home.  However,
because they do not press a claim dependent upon this fact, we will not
consider the search of Chara's home separately.

McGrane homicide and investigation. In the affidavit, Hix gave specific

information explaining why Astorga was identified as the suspect. He then

asserted a connection between Astorga and the Poolaws' property:

> On previous arrests, Michael Paul Astorga listed Marcella
> Astorga as his spouse and emergency contact. Police detectives
> have had contact with Ms. Marcella Astorga, and know her as
> Marcella Poolaw, and that she is currently pregnant. . . . .
>
> BCSO Lieutenant G. Marcantel recognized the name Poolaw and
> contacted Rick Poolaw at approximately 0830 hours and
> confirmed he had a daughter named Marcella Poolaw and she
> was pregnant by Michael Paul Astorga. Rick advised Lieutenant
> Marcantel that when he left home (343 Calle Del Banco,
> described above to be searched) that morning, Marcella had got
> up and was getting ready for work (indicating that she resides
> there at least part time). Rick Poolaw told Lieutenant Marcantel
> he would attempt to locate his daughter. Rick later contacted
> Lieutenant Marcantel and advised him that he had contacted
> Marcella's place of employment, and was told she had called in
> sick. Rick stated that Marcella had not indicated to him that she
> was sick and that it was very unusual for her not to show up for
> work. Rick stated that he would continue to attempt to locate
> Marcella. Based on the apparent fact that Marcella Poolaw
> (Astorga) resides at least part time at 343 Calle Del Banco
> (described above to be searched) it would be reasonable to
> assume that her husband, Michael Astorga, resides there at least
> part time as well and may have left or hidden evidence related to
> this crime at this residence. It is also reasonable to assume that,
> because the entire property is owned by Michael Astorga's
> in-laws, that he may have secreted himself or any evidence
> within any of the structures on the property.

In addition, the affidavit included the facts that Astorga was recently seen

by neighbors moving in at #31 Lark Road with his "girlfriend" and that

"[d]etectives attempted to contact [Marcella] at her residence located at

- 5 -

9820 Edith NW, but she was not there." A New Mexico state court judge issued a warrant on the afternoon of March 24.

That same evening, BCSO officers—but not Marcantel or Hix—executed the warrant on the Poolaws' property under the supervision of then-Sergeant Scott Baird. During the search, Rick and Cindy were handcuffed outside their home.

A few days later, Marcantel learned that Chara had called Cindy and had asked whether she could "get in trouble" for having a gun. Based on "the fact that Chara was a loved one of Michael Paul Astorga's wife" and "her admission that she had a gun," Marcantel ordered her stopped to determine whether the gun was the McGrane homicide weapon. Chara was detained, handcuffed, and held in a squad car while her car was searched. After the gun found in her car was determined not to be the murder weapon, she was released.

**B**

Alleging that the search and seizures violated the Fourth Amendment, Rick, Cindy, and Chara ("the Poolaws") brought this § 1983 action in the United States District Court for the District of New Mexico. Named as defendants were Bernalillo County Sheriff Darren White, Lieutenant Marcantel, Detective Hix, and the Bernalillo County Board of

Commissioners.[3] First, the Poolaws alleged that the detentions of Rick, Cindy, and Chara constituted unreasonable seizures ("Claim I"). Second, the Poolaws alleged that the defendants had unreasonably searched their property ("Claim II").[4] In their answer, the defendants raised a number of affirmative defenses, including qualified immunity.

On the undisputed facts, the Poolaws moved for partial summary judgment, arguing that the warrant to search their property lacked probable cause on its face or, in the alternative, omitted material information negating probable cause, and thus the search and incidental seizure of Rick and Cindy violated the Fourth Amendment. In addition, they argued that Marcantel lacked probable cause to order Chara's detention, and thus, the stop was unconstitutional. Defendants responded and filed their own motion for partial summary judgment based on qualified immunity.

In a single order, the district court granted summary judgment in favor of the Poolaws on Claims I and II, denying Marcantel and Hix qualified immunity. Poolaw v. White, Mem. Op. and Order, No. CIV 06-923, at 13 (D.N.M. Sept. 26, 2007) ("Sept. 2007 Order"). Reviewing the Hix affidavit,

---

[3] In their response to the defendants' partial motion for summary judgment, the Poolaws agreed to dismiss the claims against Sheriff White and the Bernalillo County Board of Commissioners.

[4] Initially, the Poolaws also raised state tort claims and claims of excessive force and supervisory liability, none of which are at issue in this appeal.

the district court found that it established only that Marcella was married to Astorga, that she stayed overnight at Rick and Cindy's home and did not go to work the next day, and that Astorga was on the run. Id. at 7. Regarding Astorga's connection to the property, the court concluded that the affidavit "provided only inferences and assumptions of dubious reliability," which were "simply not enough to provide probable cause to violate the Poolaws' right of privacy in their home." Id. at 8-9. In addition, the court found that Chara's status as Astorga's sister-in-law and her conversation with Cindy about a gun did not create reasonable suspicion of criminal activity justifying Chara's detention. Id. at 12-13. Concluding that these Fourth Amendment principles were clearly established when the incidents occurred, the court denied qualified immunity. Marcantel and Hix now appeal.

## II

Orders granting partial summary judgment or denying summary judgment are generally not final appealable orders under 28 U.S.C. § 1291, but we have jurisdiction to review a denial of qualified immunity if the denial turned on a question of law. Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. 737, 744 (1976) (a grant of partial summary judgment on liability but not damages is not final); Fogarty v. Gallegos, 523 F.3d 1147, 1153 (10th Cir. 2008) (a denial of qualified immunity on summary judgment is

appealable to the extent it turns on a question of law). We review the denial of a summary judgment motion raising qualified immunity de novo, Roska ex rel. Roska v. Sneddon, 437 F.3d 964, 971 (10th Cir. 2006), applying the same standard as the district court. When a defendant raises an affirmative defense of qualified immunity, the burden rests with the plaintiff to show that the defendant's actions fall outside the scope of the immunity. See Weigel v. Broad, 544 F.3d 1143, 1151 (10th Cir. 2008). In determining whether the plaintiff has made that showing, the district court considers whether the facts taken in the light most favorable to the plaintiff show that the defendant's conduct violated a constitutional right. Fogarty, 523 F.3d at 1155 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). If that initial inquiry is satisfied, the court considers whether the right violated was clearly established.[5] Id.

## A

Marcantel and Hix contend that the search of the Poolaws' property was constitutional because it was authorized by a warrant supported by probable cause. Marcantel and Hix argue in the alternative that even if the search violated the Poolaws' rights, they cannot be held liable under § 1983

---

[5] The Supreme Court made this "order of battle" discretionary in Pearson v. Callahan, 129 S. Ct. 808, 818 (2009). Because we conclude that both inquiries are necessary to our analysis, we adhere to Saucier's structure.

because they were not present when the warrant was executed.  We disagree

with both contentions.

## 1

If the Hix affidavit established probable cause for the search, the

search of the Poolaws' property was constitutional.  We review the district

court's ruling on the sufficiency of the warrant de novo, but we pay great

deference to the probable cause determination made by the judge who issued

the warrant.  United States v. Perrine, 518 F.3d 1196, 1201 (10th Cir. 2008).

We will uphold a warrant if the issuing judge had a "substantial basis for . . .

conclud[ing] that a search would uncover evidence of wrongdoing."  Illinois

v. Gates, 462 U.S. 213, 236 (1983) (quotations omitted); accord United

States v. Grimmett, 439 F.3d 1263, 1268 (10th Cir. 2006).

"In determining whether probable cause exists to issue a warrant, the

issuing judge must decide whether, given the totality of the circumstances,

there is a fair probability that contraband or evidence of a crime will be

found in a particular place."  Grimmett, 439 F.3d at 1270 (quotation

omitted); see also United States v. Harris, 369 F.3d 1157, 1165 (10th Cir.

2004) ("Probable cause exists when the facts presented in the affidavit

would warrant a man of reasonable caution to believe that evidence of a

crime will be found at the place to be searched." (quotation omitted)).  But,

a court may not "arrive at probable cause simply by piling hunch upon

hunch." United States v. Valenzuela, 365 F.3d 892, 897 (10th Cir. 2004). We assess the validity of the warrant "on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing [judge]," Maryland v. Garrison, 480 U.S. 79, 85 (1987); see Wilkins v. DeReyes, 528 F.3d 790, 802 (10th Cir. 2008), looking both at the facts that support probable cause and those that militate against it, Valenzuela, 365 F.3d at 897.

Marcantel and Hix do not contend that facts outside the affidavit, but known to the issuing judge, supported its issuance, thus we confine our review to the Hix affidavit. See Aguilar v. Texas, 378 U.S. 108, 109 n.1 (1964) ("It is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's attention."), overruled on other grounds by Gates, 462 U.S. at 238.[6] Although it describes the progress of the McGrane homicide investigation, less than a page of the Hix affidavit links the investigation to the Poolaws' property. The district court characterized the warrant as "issued because [the Poolaws'] daughter was married to Astorga, she stayed overnight at

---

[6] Before the district court, the Poolaws argued that Marcantel and Hix had knowingly or recklessly omitted information vitiating probable cause. Sept. 2007 Order, at 2; see Wolford v. Lasater, 78 F.3d 484, 489 (10th Cir. 1996). But the district court concluded that the warrant was invalid regardless of this information, and the Poolaws do not advance this argument on appeal. Because we conclude that the facts in the Hix affidavit do not support probable cause, we too need not consider it.

their house and did not go to work the next morning, and Astorga was on the run." Sept. 2007 Order, at 7. As Marcantel and Hix note, the affidavit also mentions that Astorga had listed Marcella as his emergency contact when arrested previously and that she was pregnant by him.[7] Marcantel and Hix claim that the district court erred in concluding that these facts did not provide a substantial basis for the warrant.

We start our analysis with the inarguable proposition that "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause." Ybarra v. Illinois, 444 U.S. 85, 91 (1979). In Ybarra, the proximity at issue was physical, but propinquity is specifically defined as nearness in "kindred or parentage." Black's Law Dictionary 1255 (8th ed. 2004). In United States v. Vazquez-Pulido, this court accepted the proposition that "mere propinquity" includes sibling relationships when reviewing probable cause to arrest. 155 F.3d 1213, 1216 (10th Cir. 1998) (citing Ybarra, 444 U.S. at 91). We see no reason to distinguish between probable cause to arrest, the issue in Vazquez-Pulido, and probable cause to search, the issue here. Our sibling circuits to address the question have held that a search warrant resting primarily on a "familial

---

[7] Marcantel and Hix also urge on appeal that they "knew that after Marcella received a phone call at the Plaintiffs' residence on the morning McGrane was murdered, she disappeared for hours." Appellant's Br. at 14. Because this phone call is not mentioned in the affidavit, it does not affect our analysis.

relation" is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." United States v. Herron, 215 F.3d 812, 814 (8th Cir. 2000); see also Walczyk v. Rio, 496 F.3d 139, 162-63 (2d Cir. 2007) (a warrant inaccurately implying that the defendant had lived with his mother recently did not establish probable cause to search the mother's home).

District courts directly addressing whether a familial relationship constitutes probable cause have also uniformly held that it does not. United States v. Fernandez-Morris, 99 F. Supp. 2d 1358, 1368 (S.D. Fla. 1999) (one's status as the father of a suspect is insufficient to establish probable cause); Timberlake ex rel. Timberlake v. Benton, 786 F. Supp. 676, 686 (M.D. Tenn. 1992) (one's status as the girlfriend or sister of a suspect is insufficient to establish probable cause); Doe v. City of Chicago, 580 F. Supp. 146, 150-51 (N.D. Ill. 1983) (one's status as the child of a suspect is insufficient to establish probable cause). Based on Ybarra, Vazquez-Pulido, the plain meaning of propinquity, and the unanimity of the case law from other jurisdictions, we discern a clear rule: A familial relationship to someone suspected of criminal activity, without more, does not constitute probable cause to search or arrest.

Therefore, we must consider whether the additional facts linking Astorga to the Poolaws' property provide the additional particularized

information necessary to establish probable cause.  From the face of the affidavit, the following additional facts are relevant:  (1) Astorga listed Marcella as his spouse and emergency contact during previous arrests; (2) Marcella was pregnant; (3) Marcella spent the night of the McGrane homicide at Rick and Cindy's home; (4) Marcella called in sick to work the next day, which was unusual for her; (5) Marcella resided with Astorga at #31 Lark Road; and (6) detectives also had a residence for her listed as 9820 Edith NW.

We agree with the district court that the affidavit fails to establish the "apparent fact" or "reasonable . . . assum[ption]" that either Marcella or Astorga resided "at least part time" with the Poolaws.  Rather, these are unsupported conclusions that Hix leapt to knowing only that Marcella had spent a single night there.  An overnight stay is not part-time residency. Further, the actual facts in the affidavit militate against either conclusion: Marcella and Astorga lived at a different address, #31 Lark Road, a fact confirmed by neighbors and Marcella herself, and the only alternative residence known to BCSO detectives was 9820 Edith NW.  Certainly, a single night indicated a possibility that Marcella lived at her parents' part time, but a possibility is not the probability that the Fourth Amendment requires.  Grimmett, 439 F.3d at 1270.

Further, the connection between the Poolaws' property and Astorga—the actual suspect and the would-be source of evidence of criminal activity—is even more attenuated. It relies on the assumption that if Marcella had contact with the property, so too did Astorga. The affidavit establishes a close familial connection between Astorga and Marcella, and it connects Marcella to the property because she stayed there the night of the McGrane homicide. But linking Marcella to the property is not equivalent to linking the McGrane homicide to the property; to find probable cause, it is the latter connection that must be established. See United States v. Gonzales, 399 F.3d 1225, 1231 (10th Cir. 2005). Further circumstances described in the affidavit—that Marcella had uncharacteristically called in sick to work—do not rise to a fair probability that such a connection exists, particularly in light of the fact that Astorga and Marcella resided elsewhere. See Harris, 369 F.3d at 1165.

No fact in the Hix affidavit suggests that Marcella had any contact with Astorga or that Astorga had any contact with the Poolaws' property during which time Astorga could have hidden evidence of the McGrane

homicide.[8]  Rather, following its description of Marcella's connection to the

property, the Hix affidavit enters into pure speculation:

> Based on the <u>apparent fact</u> that Marcella Poolaw (Astorga)
> resides at least part time at 343 Calle Del Banco . . . it would be
> <u>reasonable to assume</u> that her husband, Michael Astorga, resides
> there at least part time as well and may have left or hidden
> evidence related to this crime at this residence.  It is also
> <u>reasonable to assume</u> that, because the entire property is owned
> by Michael Astorga's in-laws, that he may have secreted himself
> or any evidence within any of the structures on the property
> (emphases added).

Thus, the ultimate conclusion that Astorga or evidence of the McGrane

homicide would be found at the Poolaws' property was based on a mere

hunch that Astorga lived there, piled upon the hunch that Marcella lived at

the property.[9]  <u>See</u> <u>Valenzuela</u>, 365 F.3d at 897; <u>see also</u> <u>Gonzales</u>, 399 F.3d

---

[8] The defendants argue that reviewing Astorga's contact with the property starting from the time of the McGrane homicide ignores the possibility that evidence of the Martinez homicide, which occurred several months earlier, would be found on the property.  However, having rejected the unfounded assumption that Marcella or Astorga "resided at least part time" at the Poolaws', we see no factual basis in the affidavit connecting Astorga to the Poolaws' property prior to the McGrane homicide.  To the contrary, the only time period to which the affidavit refers is "03/21/06 and 03/22/06 [until] the present time."

[9] The dissent agrees that we must ignore the unsupported conclusions asserted in the affidavit.  Dissenting Op. at 15.  However, in concluding that probable cause exists, the dissent relies on similar assumptions:  that Astorga would seek out his family, that Marcella stayed with her parents "at least occasionally," that she "may well have had contact with Astorga," and that "[i]f she had contact with Astorga[,] . . . evidence <u>might</u> be available on the Poolaw property."  <u>Id.</u> at 3-5 (emphasis added).  As with the affidavit, this chain of "inferences," <u>id.</u> at 2, does not establish the requisite factual

(continued...)

at 1229-30 (an officer cannot reasonably rely upon a warrant containing "no facts explaining how the address was linked to [the defendant] . . . or the suspected criminal activity, or why the officer thought the items to be seized would be located at the residence").

Nonetheless, Marcantel and Hix argue that "[l]aw enforcement officers know and are trained that fugitives like Astorga will run to their family and friends," and that this experience is sufficient to establish a substantial nexus between Astorga and the Poolaws' property. Appellant's Br. at 14. Marcantel and Hix claim that our precedent does not require law enforcement officers to obtain direct evidence or possess personal knowledge that evidence or contraband is located on property to be searched; rather, they contend that officers can rely on training and experience to establish the required nexus. They cite United States v. $149,442.43 in U.S. Currency for the proposition that "[c]ourts often rely on the opinion of police officers as to where contraband may be kept." 965 F.2d 868, 874 (10th Cir. 1992) (citations omitted). But unlike the affidavit at issue in $149,442.43 in U.S. Currency, the Hix affidavit does not mention

---

<sup>9</sup>(...continued)
connection between Astorga and the Poolaws' property. See Valenzuela, 365 F.3d at 897.

any training or experience regarding where fugitives hide.[10]  Even if Hix had

included such training in the affidavit, an officer's expertise cannot be

invoked to nullify the Supreme Court's holding that mere propinquity is

insufficient to establish probable cause.  Ybarra, 444 U.S. at 91.

Considering the totality of the circumstances and the lack of specific

information linking Astorga to the Poolaws' property, we conclude that

there was not probable cause to issue the search warrant.  See Grimmett, 439

F.3d at 1270.

Because there was no probable cause to issue the warrant, the search

of the Poolaws' property violated their Fourth Amendment rights.

Moreover, because the "search [wa]s illegal and not supported by probable

cause, the justification for using the search as the foundation for the seizure

disappears because it was the connection of the individual with a location

suspected of harboring criminal activity that provided the reasonable basis

for the seizure."  Jacobs v. City of Chicago, 215 F.3d 758, 772 (7th Cir.

2000) (citation omitted); see also Michigan v. Summers, 452 U.S. 692, 703

(1981) ("[A] detention represents only an incremental intrusion on personal

---

[10] The Hix affidavit states only that Hix has experience and training in
homicides generally.  For an officer's experience and training to support a
finding of probable cause, the affidavit must set out facts explaining why,
based on this experience and training, there was reason to believe the
contraband is more likely to be found at the particular location.  United
States v. Rowland, 145 F.3d 1194, 1205 n.5 (10th Cir. 1998).

liberty when the search of a home has been authorized by a <u>valid warrant</u>."
(emphasis added)).  Because Marcantel and Hix do not assert independent
cause or suspicion for the detention of Rick and Cindy while their property
was searched, this seizure also violated their constitutional rights.  <u>Jacobs</u>,
215 F.3d at 772.

**2**

We next consider Marcantel and Hix's assertion that even if the search
and seizure violated the Poolaws' Fourth Amendment rights, they cannot be
liable under § 1983 because they were not present during its execution.
While a supervisory relationship alone is insufficient for liability under
§ 1983, <u>Duffield v. Jackson</u>, 545 F.3d 1234, 1239 (10th Cir. 2008), an
officer need not execute a search personally to be liable.  <u>See</u> <u>Snell v.
Tunnell</u>, 920 F.2d 673, 700-01 (10th Cir. 1990).  Rather, a defendant may be
liable if a plaintiff can show that an "affirmative link exists between the
[constitutional] deprivation and either the [officer's] personal participation,
his exercise of control or direction, or his failure to supervise."  <u>Green v.
Branson</u>, 108 F.3d 1296, 1302 (10th Cir. 1997) (quotation omitted).  That
showing can be made with "deliberate, intentional act[s]" that "caused or
contributed to the . . . violation."  <u>Jenkins v. Wood</u>, 81 F.3d 988, 994-95
(10th Cir. 1996) (quotation omitted).

> For liability under section 1983, direct participation is not necessary. Any official who "causes" a citizen to be deprived of her constitutional rights can also be held liable. The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.

Snell, 920 F.2d at 700 (quoting Conner v. Reinhard, 847 F.2d 384, 396-97 (7th Cir. 1988)); see also Buck v. City of Albuquerque, 549 F.3d 1269, 1279-80 (10th Cir. 2008).

In order for the plaintiffs to prevail on their claims, therefore, they must show that Marcantel and Hix set in motion a series of events they knew or reasonably should have known would result in the search of the Poolaws' property and the seizure of Rick and Cindy.  Given that Marcantel ordered the search and Hix swore out the affidavit, it strains credulity that they would not have known these clearly intentional acts would lead directly to the search.  On the record before us, however, it is far less clear whether they knew or reasonably should have known that these actions would cause the seizure, and the district court gave this question perfunctory analysis. Nonetheless, viewing the record and drawing the reasonable inferences therefrom in the light most favorable to the Poolaws, as we must, Weigel, 544 F.3d at 1151, we conclude that a reasonable jury could find Marcantel and Hix knew or reasonably should have known the Poolaws would be seized incident to the search.  In particular, Sergeant Baird testified in his

deposition that it was BCSO standard procedure to handcuff the people present in a home during a search, and there is no evidence in the record that Marcantel and Hix believed an exception would occur during this particular search. For these reasons, Marcantel and Hix are not entitled to qualified immunity on summary judgment despite not being present when the Poolaws' Fourth Amendment rights were violated.[11]

**B**

Because Marcantel and Hix violated the Poolaws' constitutional rights, we must inquire whether the rights were clearly established such that a reasonable person in the position of Marcantel or Hix would have been aware that the search and seizure were unconstitutional when they occurred. Weigel, 544 F.3d at 1153. Because the defendants assert that they are entitled to qualified immunity on the undisputed facts, this is a question of law. See Keylon v. City of Albuquerque, 535 F.3d 1210, 1217-18 (10th Cir. 2008).

_____

[11] We note that in this interlocutory appeal, the court has jurisdiction solely to review the issues of law raised by the denial of qualified immunity to Marcantel and Hix. Mitchell, 472 U.S. at 530. We acknowledge that because the district court granted partial summary judgment to the plaintiffs on this claim, it will proceed to trial solely on the question of damages following this decision. However, qualified immunity is immunity to suit, not a defense to liability. Id. at 526. This distinction is apt in a case such as this: Marcantel and Hix can challenge both liability and damages in a single appeal after trial. Thus, we do not pass on whether there is a disputed issue of material fact or on the merits of whether the defendants are liable for these constitutional violations.

> Ordinarily, in order for the law to be clearly established, there
> must be a Supreme Court or Tenth Circuit decision on point, or
> the clearly established weight of authority from other courts
> must have found the law to be as the plaintiff maintains. The
> plaintiff is not required to show, however, that the very act in
> question previously was held unlawful in order to establish an
> absence of qualified immunity.

Weigel, 544 F.3d at 1153 (quotations omitted). Our inquiry is whether the

contour of the divide is "sufficiently clear that a reasonable official would

understand that what he is doing violates that right." Hope v. Pelzer, 536

U.S. 730, 739 (2002) (quotation omitted).

This court has unambiguously held that probable cause cannot be

established, as noted, "simply by piling hunch upon hunch." Valenzuela,

365 F.3d at 897. As explained above, the only link between the McGrane

homicide and the Poolaws' property was the unjustified conclusion that

Marcella lived there at least part time and the follow-on conjecture that

Astorga lived there as well. It is clearly established in our Fourth

Amendment jurisprudence that probable cause for a warrant requires a fair

probability that the evidence sought would be found on the property.

Grimmett, 439 F.3d at 1268, 1270. As we held in Gonzales, the necessity of

a nexus between the suspected criminal activity and the particular place to

be searched is so well established that in the absence of such a connection,

"the affidavit and resulting warrant are so lacking in indicia of probable

cause as to render official belief in its existence entirely unreasonable."
399 F.3d at 1231 (quotation omitted).

Specifically, it is clearly established that mere propinquity is
insufficient to establish probable cause. Ybarra, 444 U.S. at 91.  That
neither the Supreme Court nor the Tenth Circuit has explicitly held that
propinquity includes parents-in-law and sisters-in-law is immaterial given
the plain meaning of propinquity and the unanimity of courts holding that a
familial relationship does not establish probable cause. See York v. City of
Las Cruces, 523 F.3d 1205, 1211-12 (10th Cir. 2008) ("[T]he clearly
established weight of authority from other courts" establishes a right for the
purposes of qualified immunity.).  Under the clearly established standards
for what constitutes probable cause, no reasonable officer could have
believed that the meager facts related to the Poolaws' property described in
the Hix affidavit established more than a possibility that evidence of the
McGrane homicide would be found there.  The affidavit was "so lacking in
indicia of probable cause as to render official belief in its existence
unreasonable." Malley v. Briggs, 475 U.S. 335, 345 (1986).  Thus,
Marcantel and Hix could not have "reasonably but mistakenly conclude[d]
that probable cause [wa]s present," and they are not entitled to qualified

immunity.[12]  Cortez v. McCauley, 478 F.3d 1108, 1120 (10th Cir. 2007) (en banc).

The dissent presses the point that because Marcantel and Hix sought and obtained a search warrant from a judge, they should be entitled to qualified immunity unless they intentionally misled the judge.  Dissenting Op. at 14-16.  This conclusion is misguided for two reasons.

First, it is clearly established that "employ[ing] a reasonable process in seeking the warrant" does not relieve officers of their constitutional duty to "exercise their own professional judgment" as to the existence of probable cause.  Gonzales, 399 F.3d at 1230.  The very case on which the dissent relies stands for the proposition that the issuance of a warrant by a magistrate does not immunize officers:

> It is true that in an ideal system an unreasonable request for a warrant would be harmless, because no judge would approve it. But ours is not an ideal system, and it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should.  We find it reasonable to require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment.

[12] In a petition for rehearing, appellants argue that "[t]he majority's failure to apply the Leon 'good faith' exception to this case, and its refusal to grant immunity to the Defendants on that basis, leaves open an important question."  Appellants fail to note that they neither raised this potentially meritorious issue at the trial court level nor did they brief or argue it to this panel.  Because of this failure, we do not consider the issue.  See Oliveros v. Mitchell, 449 F.3d 1091, 1095 (10th Cir. 2006) (issues not raised before the district court are waived); Becker v. Kroll, 494 F.3d 904, 913 n.6 (10th Cir. 2007) (issues not raised in opening appellate brief are waived).

Malley, 475 U.S. at 345-46. Thus, it is not conclusive, as the dissent suggests, that "[a] law trained judge found the affidavit sufficient to establish probable cause and issued the warrant," Dissenting Op. at 10, as the issuance of the warrant simply does not control the outcome of our inquiry into the officers' exercise of their own professional judgment. Malley, 475 U.S. at 345-46.

Second, it is beyond question that an officer's duty to exercise his independent professional judgment is not met simply because he lacks subjective bad faith. Rather, the inquiry is an objective one: "whether a reasonably well-trained officer in [the defendant's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." Malley, 475 U.S. at 345; accord Keylon, 535 F.3d at 1218 ("After Harlow [v. Fitzgerald, 457 U.S. 800 (1982)], qualified immunity does not depend on the officer's subjective, good faith belief that he was not violating clearly established federal law, but instead the defense now hinges on whether that belief was reasonable."); Bruning v. Pixler, 949 F.2d 352, 356 (10th Cir. 1991) ("The subjective component [of qualified immunity] focused on the good faith of the official and relieved him from liability if he did not actually know his conduct was unconstitutional and did not act with malicious intent. Harlow eliminated

any consideration of the defendant's intent as it relates to his knowledge of the law . . . ."). Whether the officers intentionally misled the judge is simply of no moment unless such intent is an element of the plaintiffs' claims, which it is not here. See Bruning, 949 F.2d at 356; Meyer v. Bd. of County Comm'rs of Harper County, 482 F.3d 1232, 1242 (10th Cir. 2007) ("Subjective good faith or bad faith of government actors is ordinarily irrelevant to the objective inquiry whether a reasonable officer would have realized that his conduct was unlawful."). As we explain above, given the absence of a factual connection other than Marcella between Astorga and the Poolaws' property, an officer could not reasonably apply for a search warrant believing that probable cause existed.[13]

---

[13] The dissent also argues that although mere propinquity, without more, does not give rise to probable cause, Ybarra, 444 U.S. at 91, "[t]here is no clearly established law explicitly saying how an officer seeking to obtain a warrant is supposed to know how much 'more' than a familial relationship is required." Dissenting Op. at 17. The dissent further states that our decision "admits" that there is "more in this case" and "demand[s] a lot more." Id. But the dissent misapprehends our analysis. Although there are facts in the affidavit other than the Poolaws' familial relationship, none of these additional facts makes the necessary connection between Astorga and the Poolaws' property or Marcella and the McGrane homicide. It is this complete absence of facts beyond mere propinquity connecting the suspect to the property that leads us to conclude that Marcantel and Hix could not reasonably believe that there was probable cause to search the Poolaws' property.

We thus affirm the district court's denial of Marcantel and Hix's motion for summary judgment related to the search of the Poolaws' property and the resulting detention of Rick and Cindy.[14]

### III

Marcantel also asserts that he is entitled to qualified immunity for the detention of Chara because he did not violate her Fourth Amendment right to be free from unreasonable seizures.[15]  He acknowledges that he ordered the stop, but asserts that it was based on reasonable suspicion.  We disagree: Chara's status as Astorga's sister-in-law and her conversation with Cindy about a gun did not establish a reasonable suspicion that she was committing or had committed a crime.

### A

Law enforcement officers may "conduct an investigatory stop if they have a 'reasonable suspicion, grounded in specific and articulable facts, that

---

[14] It is clearly established that temporarily seizing a person while a search is conducted is justified only when the search itself is constitutional.  See Florida v. Royer, 460 U.S. 491, 499 (1983); Summers, 425 U.S. at 703.  Thus, because Marcantel and Hix do not allege that they had an independent reason to seize Rick and Cindy, we also affirm the denial of the appellants' motion for summary judgment on Rick and Cindy's seizure claim.

[15] Marcantel argues that he cannot be liable for exceeding the scope of the reasonable suspicion justifying the stop because he was not present when the stop was executed.  Because we conclude there was no reasonable suspicion to support Marcantel's decision to order the stop at its outset, we need not consider whether the stop exceeded the scope of suspicion.

- 27 -

a person they encounter was involved in or is wanted in connection with'" a crime in progress, a completed felony, or perhaps, a completed misdemeanor. United States v. Moran, 503 F.3d 1135, 1141-43 (10th Cir. 2007) (quoting United States v. Hensley, 469 U.S. 221, 229 (1985)). Reasonable suspicion is established if the "totality of the circumstances suffices to form a particularized and objective basis for a stop." Id. at 1140 (quotations omitted). "[T]he level of suspicion required for reasonable suspicion is 'considerably less' than proof by a preponderance of the evidence or that required for probable cause. . . . Officers merely need an articulable reasonable suspicion that criminal activity may be afoot—they need not even assert a 'fair probability' that their investigation will actually turn up evidence of criminal activity." United States v. Lopez, 518 F.3d 790, 799 (10th Cir. 2008) (citation omitted).  However, reasonable suspicion may not be based on a mere hunch or conjecture. See United States v. Karam, 496 F.3d 1157, 1162 (10th Cir. 2007); United States v. Caro, 248 F.3d 1240, 1246 (10th Cir. 2001).

Marcantel argues that he had reasonable suspicion to believe that Chara had the McGrane homicide weapon in her car when he ordered the stop.  He relies on three facts for this conclusion:  (1) Chara told her mother

she was anxious about having a gun in her car, (2) Chara was Astorga's sister-in-law, and (3) the McGrane homicide weapon had not been found.[16]

Because it is lawful to carry a gun in a vehicle in New Mexico, N.M. Stat. § 30-7-2(A)(2); United States v. King, 990 F.2d 1552, 1563 n.5 (10th Cir. 1993); State v. Gutierrez, 94 P.3d 18, 22 (N.M. Ct. App. 2004), Chara's admission that she had a gun does not weigh heavily in our reasonable suspicion calculus—particularly in light of the fact that Marcantel knew the Poolaws legally owned firearms. We next weigh Chara's anxiety during the phone call, but in light of the fact that her home had just been searched by a team of law enforcement, we consider such anxiety to be akin to nervousness during a police encounter. "'We have repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on . . . nervousness . . . as a basis for reasonable suspicion . . . must be treated with caution.'" United States v. Wood, 106 F.3d 942, 948 (10th Cir. 1997) (quoting United States

---

[16] Marcantel and Hix do not argue that they were suspicious of any criminal activity other than involvement in the McGrane homicide, so that is the only justification for the stop we consider. Although Marcantel explained that he ordered the stop to "find out what gun is she [sic] talking about," to the extent his goal was to determine that the gun was not the murder weapon and to eliminate Chara as a suspect, that ground cannot justify the detention. Suspicion of criminal activity "must be . . . particularized with respect to the person" to be searched or seized, see Ybarra, 444 U.S. at 91, and thus the desire to confirm an individual's innocence cannot support an intrusion on her Fourth Amendment rights.

v. Fernandez, 18 F.3d 874, 879 (10th Cir. 1994)) (alterations original).

Given the paucity of additional information on which Marcantel based his

decision, this case is quite unlike those in which this court has identified

significant additional factors supporting the connection between

nervousness and reasonable suspicion. See, e.g., United States v. Alcaraz-

Arellano, 441 F.3d 1252, 1260 (10th Cir. 2006) (defendant had implausible

travel plans and suspiciously purchased a used vehicle); United States v.

Bradford, 423 F.3d 1149, 1157-58 (10th Cir. 2005) ("[Defendant's] answers

to basic questions were evasive and conflicting at best, and the story she

told defied common sense, particularly the financial illogic of purchasing a

series of one-way plane tickets and one-way car-rentals."); see also United

States v. Santos, 403 F.3d 1120, 1127 (10th Cir. 2005) ("[N]ervousness is a

sufficiently common—indeed natural—reaction to confrontation with the

police that unless it is unusually severe or persistent, or accompanied by

other, more probative, grounds for reasonable suspicion, it is of limited

significance in determining whether reasonable suspicion exists."

(quotations and citations omitted)).  Thus, on the facts of this case, we give

little weight to Chara's anxiety.

Because we examine the totality of the circumstances, we add the final

relevant fact to our calculus:  Chara was Astorga's sister-in-law.  As above,

we consider that "'a person's mere propinquity to others independently

suspected of criminal activity,' create[s] neither probable cause nor reasonable suspicion." United States v. Tehrani, 49 F.3d 54, 59 (2d Cir. 1995) (quoting Ybarra, 444 U.S. at 91). Ybarra itself rejected the argument that propinquity alone was sufficient to justify an investigative detention. 444 U.S. at 91-93. Thus, our holding above applies equally to the stop of Chara: Without more, a familial connection to a suspect does not establish reasonable suspicion.

Marcantel does not argue that he knew of anything beyond mere propinquity connecting Chara and Astorga. Because the status of an individual, rather than her behavior, cannot be particularized to a specific accusation, we are wary of giving it much weight. See United States v. Freeman, 479 F.3d 743, 749 (10th Cir. 2007). In Freeman, we held that the defendant's parolee status and criminal history, even when combined with his agitation and his girlfriend's sudden movement, did not create reasonable suspicion without other particularized objective facts. Id. Chara's status as Astorga's sister-in-law, when combined with nothing more than her possession of a firearm and her anxiety, similarly fails to establish reasonable suspicion. Thus, because Marcantel did not reasonably suspect that Chara was involved in the McGrane homicide, he violated her Fourth

Amendment right to be free from unreasonable seizures by ordering the stop.[17]

## B

Marcantel does not challenge whether the law regarding Chara's stop is clearly established, but we consider it because it is a question of law on which the plaintiffs bear the burden of proof. See Weigel, 544 F.3d at 1151. That "mere propinquity" does not create reasonable suspicion is clearly established, and its contours encompass familial relationships. See supra Part II.B. Further, it is clearly established that nervous behavior is of minimal significance in determining reasonable suspicion. Wood, 106 F.3d at 948. Thus, Chara's stop violated her clearly established Fourth Amendment rights. For that reason, we affirm the district court's denial of Marcantel's motion for summary judgment based on qualified immunity with respect to the detention of Chara.

## IV

**AFFIRMED**.

---

[17] As with the search, Marcantel argues that because he was not present when the stop was executed, he cannot be held liable under § 1983. See Duffield, 545 F.3d at 1239. As before, because Marcantel ordered the stop, he engaged in a "deliberate, intentional act" that directly led to the constitutional violation. Jenkins, 81 F.3d at 995 (quotation omitted). Because Marcantel "caused or contributed to the . . . violation," he can be held liable under § 1983. Id. at 994.

07-2254, *Poolaw v. Marcantel*

**O'BRIEN**, J., dissenting.


Regrettably, I can find comfort in no part of the majority opinion. Contrary to its views: 1) there was probable cause to search the Poolaw property; 2) even if probable cause had been lacking no constitutional violation occurred because the search was conducted in good faith reliance upon a warrant issued by a detached and impartial judge; 3) because the search of the Poolaw property was lawful the seizure of Rick and Cindy Poolaw incident to that search violated no constitutional rights; 4) we have jurisdiction to conduct an interlocutory review of the summary judgment entered in favor of the Poolaws on the seizure issue and should reverse; 5) the stop of Chara Poolaw was proper based upon reasonable suspicion of criminal activity; and 6) at no time did Marcantel and Hix act contrary to clearly established law.  I respectfully dissent.

## I.  SEARCH OF THE POOLAW PROPERTY

When government officials abuse their authority, damages actions may provide the injured individual "the only realistic avenue for vindication of constitutional guarantees."  *Harlow v. Fitzgerald*, 457 U.S. 800,  814 (1982).  However, such damages actions also inflict substantial social costs, including the expense of litigation, the diversion of public resources from pressing public issues, the deterrence of citizens from accepting public

office and the potential reticence of public officials in the performance of their official duties for fear of being sued. *Id.* Qualified immunity seeks to accommodate these competing values, shielding officers from damages liability for the performance of their discretionary functions so long as their actions are objectively reasonable in light of the clearly established law at the time of their actions. *Id.* at 818. That standard "gives ample room for mistaken judgments," protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986).

A. Constitutional Violation

1. Probable Cause

In its probable cause analysis the majority posits that a familial relationship, <u>without more</u>, is insufficient to establish probable cause to search. *United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th Cir. 1998). Conceding there is "more" in this case, the majority says there is not enough "more" to establish probable cause. I see it differently. Considering the totality of the circumstances related in the affidavit for the search warrant and the reasonable inferences to be drawn from the recited facts, there was probable cause.

Astorga's relationship with Marcella Poolaw Astorga (his wife) and her relationship with Rick and Cindy Poolaw (her parents) may not, alone,

have been sufficient to establish probable cause to search the Poolaw

property, but the dynamics of those relationships are entitled to

considerable weight in the totality of the circumstances, particularly if one

draws common sense inferences from those relationships. And more than

mere familial relationships are at play here. The affidavit for the search

warrant, executed on March 24, 2006, two days after the murder, establishes

the following:

- Astorga was the prime suspect in the murder of Deputy McGrane, which occurred at about 12:45 a.m. on March 22, 2006. Astorga's vehicle had been stopped by McGrane who reported the vehicle's description and license plate number to dispatch. A short time later McGrane's patrol vehicle was found at the location of the stop with its emergency lights flashing. McGrane was found on the ground, dead from a single gunshot to the head.
- An active warrant authorized Astorga's arrest for an unrelated November 2005 homicide in Albuquerque. For months the police had been trying to find him and execute the warrant.
- Marcella was married to Astorga and pregnant with his child.
- Astorga and Marcella recently moved into a residence at #31 Lark Road—a move that occurred while Astorga was a fugitive from justice.
- A few hours after the McGrane murder Astorga's vehicle was found near the Lark Road residence.
- Astorga was on the run and the subject of a manhunt for two murders; a warrant had issued to arrest Astorga for the McGrane murder in addition to the other murder warrant.
- Marcella is the daughter of Rick and Cindy Poolaw.
- On the night of the McGrane murder Marcella was not at the residence she shared with Astorga, but at her parents' house.
- Marcella's behavior the morning of the McGrane murder, March 22, was peculiar. When her father, Rick, left the house (prior to 8:30 a.m.) she was up and getting ready for work. But she called work claiming to be ill even though she never indicated any

illness to Rick and it was unusual for her to miss work.  Her
whereabouts the rest of the morning and into the afternoon were
unknown.

•   Marcella was located at approximately 1:30 p.m.  She
acknowledged to police officers her relationship with Astorga
and their recent move to the #31 Lark Road residence.  She
provided the keys to the residence and a sketch of its floor plan.

•   There are a number of buildings on the Poolaw property.

•   Search warrants had been obtained and executed for several
locations other than the Poolaw property.  Astorga had not been
located.

**[App. at 64-68]**

A prudent person could reasonably presume Astorga, on the run

without his vehicle, would seek succor from family and friends—including

assistance in escape or in hiding or destroying evidence.  The majority says

such an inference cannot be drawn absent expert opinion based on training

and experience, which the affidavit failed to supply.[1]  I think it is a matter

---

[1] The record reveals police officers are trained that fugitives like
Astorga will seek assistance from family and friends.  Indeed, Rick, a
former police officer, admitted he received such training and was concerned
Astorga would attempt to contact Marcella.  The majority discounts this fact
because Hix, while stating in the affidavit his experience and training in the
investigations of homicides in general, does not mention any particular
training or experience regarding where fugitives hide.  But this is common
sense, which is relevant in the probable cause analysis.  *See Illinois v.
Gates*, 462 U.S. 213, 231 (1983) ("In dealing with probable cause, as the
very name implies, we deal with probabilities.  These are not technical; they
are the factual and practical considerations of everyday life on which
reasonable and prudent men, not legal technicians, act . . . .  Long before the
law of probabilities was articulated as such, practical people formulated
*certain common-sense conclusions about human behavior . . . .*") (emphasis
added) (quotations omitted); *see also United States v. Grimmett*, 439 F.3d
1263, 1270 (10th Cir. 2006) ("A reviewing court is to interpret search
warrant affidavits in a *common sense and realistic fashion*.  The issuing
(continued...)

- 4 -

well within the ken of most people, certainly within the ken of a judge considering whether to issue a search warrant. Indeed, the concept is enshrined in the New Mexico statutes and case law (as well as the statutes of many other states). *See* N.M. Stat. Ann. § 30-22-4 ("Harboring or aiding a felon consists of any person, *not standing in the relation of husband or wife, parent or grandparent, child or grandchild, brother or sister by consanguinity or affinity,* who knowingly conceals any offender or gives such offender any other aid, knowing that he has committed a felony, with the intent that he escape or avoid arrest, trial, conviction or punishment.") (emphasis added); *see also State v. Mobbley*, 650 P.2d 841, 842 (N.M. Ct. App. 1982) (explaining § 30-22-4 grew out of the common law of accessories after the fact which excluded wives from being accessories after the fact to their husbands' misdeeds and noting that like other states New Mexico broadened the exemption to cover other close relatives—"'[t]his broadening of the excemption [sic] may be justified on the ground that *it is unrealistic to expect persons to be deterred from giving aid to their close relations*'") (emphasis added) (quoting LaFave & Scott, Criminal Law § 66 (1972)).

---

(...continued)

judge is entitled to go beyond the averred facts and *draw upon common sense in making reasonable inferences from those facts.*") (emphasis added) (citation omitted).

It is logical, as well as reasonable, to assume Astorga would seek out his pregnant wife, Marcella, for assistance and support. And Marcella had relevant ties to her parents' property—she stayed there the night McGrane was murdered and exhibited peculiar behavior that morning. A prudent person could reasonably conclude Marcella's unusual behavior and disappearance on the very day her husband was targeted with the murder of McGrane was more than mere coincidence. She may well have had contact with Astorga on March 22, whether on the Poolaw property or elsewhere, and evidence of that contact or other evidence useful to the McGrane murder investigation (such as a gun, ammunition or other physical evidence; clues to finding and arresting Astorga—a slip of paper with an address, a plan, a phone number, a name; a cell phone containing a record of calls) could well be located on the grounds or in one of several buildings. One could reasonably conclude Marcella had a cordial relationship with her parents and was, at least occasionally, at their home. She was there on March 22 and could have been there between March 22 and March 24. If Astorga had been on the Poolaw property or if Marcella had contact with Astorga and was later at her parents' house evidence might be available on the Poolaw property. It is unlikely she would leave evidence at the Lark Road residence she shared with Astorga because she knew it was an object of police

interest.[2]

The affidavit acknowledged Rick Poolaw's cooperation with the police and one could conclude it was unlikely he would help Astorga or knowingly permit Astorga to be on his property. On the other hand one could conclude he might not know all that happened in the buildings or on the grounds of his property in the wee hours of March 22 or during his absence from the property later that day. The affidavit also acknowledged Marcella's assistance to the police in providing keys to the residence she shared with Astorga and a sketch of its floor plan.[3] One might conclude her cooperation was plenary, negating the need for further investigation. One would be naïve to think so. It is highly likely Marcella would have conflicting loyalties between protecting her husband and cooperating with law enforcement officers. Her cooperation could well have been calculated and limited.

In any event the acknowledged cooperation of Rick and Marcella did

---

[2] The affidavit urged the judge to assume she lived at her parents' home at least part time. *See* discussion *infra* at 17. That inference was not warranted. A more limited inference—that she occasionally was at her parents' house and may have been there between March 22 and March 24—does not suffer from the same overbreadth and is consistent with ordinary behavior. The record confirms the propriety of such an inference; Marcella was at her parents' home when the search warrant was executed on March 24.

[3] The inclusion of the Poolaw family's cooperation in the affidavit suggests Hix was not attempting to mislead the judge.

not eliminate the Poolaw property as a source of evidence in the McGrane murder investigation. It is possible that evidence relating to the murder or the whereabouts of Astorga would be found there. A reasonable person could conclude it was more than possible—actually probable. Certainly the judge who issued the search warrant thought so. We are obliged to respect that determination, if we can reasonably do so. *See Gates*, 462 U.S. at 236 ("[W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts.") (quotations omitted). We can, and clearly should, afford substantial (perhaps controlling) deference to the judge's finding of probable cause. At worst the probable cause issue here is doubtful or marginal. *See United States v. Ventresca*, 380 U.S. 102, 106 (1965) ("[I]n a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall."). The question is not whether seeking (or issuing) the search warrant was wrong, but whether it was unreasonable to do so. And in this § 1983 case the warrant should be clear grounds for qualified immunity, our differences with respect to probable cause notwithstanding. "If judges . . . disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999) (discussing a

circuit split with respect to clearly established law). *See also Arnsberg v. United States*, 757 F.2d 971, 981 (9th Cir. 1984) (granting qualified immunity to officers in spite of invalid arrest warrant).

But irrespective of our differing, post hoc, views of probable cause one thing is not fairly debatable—the applicability of the *Leon* doctrine. *See United States v. Leon*, 468 U.S. 897 (1984). Marcantel and Hix are entitled to qualified immunity because they did nothing wrong in seeking a search warrant and the officers performing the search acted in good faith reliance on it. There was no constitutional violation here even if these officers misperceived the probable cause threshold.[4]

## 2. The *Leon* Doctrine

"To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable

---

[4] Marcantel and Hix do not, by name, address the *Leon* good faith exception. They do, however, argue the district court improperly overlooked the review and approval of the affidavit by an assistant district attorney and failed to afford deference to the issuing judge's probable cause determination. In response, the Poolaws, who bear the burden of proof on the qualified immunity issue, *see Smith v. Cochran*, 339 F.3d 1205, 1211 (10th Cir. 2003), claim Marcantel and Hix cannot rely on the district attorney's approval because the affidavit was so lacking in indicia of probable cause as to render their belief in its existence unreasonable and the district court properly declined to defer to the issuing judge's probable cause determination because the affidavit did not contain a substantial basis for concluding probable cause existed. This is the language of *Leon* and *Malley*, discussed *infra*. Consequently, because it is a question of law upon which the Poolaws bear the burden of proof, has, in substance, been addressed by the parties, and a failure to address it would result in a miscarriage of justice, we should consider it. *See Singleton v. Wulff*, 428 U.S. 106, 121 (1976); *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1227-28 (10th Cir. 2008).

that such deterrence is worth the price paid by the justice system." *Herring v. United States*, – U.S. –, 129 S. Ct. 695, 702 (2009). In a criminal case, evidence seized pursuant to a warrant issued by a neutral and detached magistrate later found invalid is admissible if the executing officer acted in objective good faith and with reasonable reliance on the warrant. *Leon*, 468 U.S. at 922-23.[5] The Supreme Court recently expounded: "In *United States v. Leon* . . . we created an exception to the exclusionary rule when officers reasonably rely on a facially valid search warrant. In that context, we recognized that a defendant challenging a search will lose if either: (1) the warrant issued was supported by probable cause; or (2) it was not, but the officers executing it reasonably believed that it was." *Pearson v. Callahan*, –U.S.–, 129 S. Ct. 808, 821 (2009) (citation omitted).

*Leon* recognized four situations in which an officer cannot be found to have relied on a warrant in good faith: 1) the issuing judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; 2) the

---

[5]     In analyzing the applicability of the [exclusionary] rule, *Leon* admonished that we must consider the actions of all the police officers involved. 468 U.S., at 923, n. 24, 104 S. Ct. 3405 ("It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination").

*Herring*, 129 S. Ct. at 699-700.

issuing judge "wholly abandoned his judicial role"; 3) the warrant was "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid"; and 4) "[the] affidavit [is] so lacking in probable cause as to render official belief in its existence *entirely unreasonable*." *Leon*, 468 U.S. at 923 (emphasis added) (quotations omitted).  In summary the Court said: "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 926.  It then applied the newly minted test to Leon's arguments:

> Officer Rombach's application for a warrant clearly was supported by much more than a "bare bones" affidavit.  The affidavit related the results of an extensive investigation and, as the opinions of the divided panel of the Court of Appeals make clear, provided evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause.  Under these circumstances, the officers' reliance on the magistrate's determination of probable cause was objectively reasonable, and application of the extreme sanction of exclusion is inappropriate.

*Id.*

The *Leon* doctrine applies not only to suppression issues in criminal cases but in qualified immunity cases as well.  In *Malley*, the Supreme Court

- 11 -

held "the same standard of objective reasonableness that we applied in the

context of a suppression hearing in *Leon* . . . defines the qualified immunity

accorded an officer whose request for a warrant allegedly caused an

unconstitutional [search]." 475 U.S. at 344.  "Only where the warrant

application is so lacking in indicia of probable cause as to render official

belief in its existence unreasonable will the shield of immunity be lost." *Id.*

at 344-45 (citation omitted).  Elaborating, the Court said:

> In *Leon*, we stated that our good-faith inquiry is confined to the
> objectively ascertainable question whether a reasonably well-
> trained officer would have known that the search was illegal
> despite the magistrate's authorization.  The analogous question
> in [a § 1983 qualified immunity] case is whether a reasonably
> well-trained officer in petitioner's position would have known
> that his affidavit failed to establish probable cause and *that he
> should not have applied for the warrant*.  If such was the case,
> the officer's application for a warrant was not objectively
> reasonable [and he is not entitled to immunity].

*Id.* at 345 (emphasis added); *see also Groh v. Ramirez*, 540 U.S. 551, 565

n.8 (2004); *Davis v. Gracey,* 111 F.3d 1472, 1480 (10th Cir. 1997); *Beard v.*

*City of Northglenn, Colo.*, 24 F.3d 110, 114 n.3 (10th Cir. 1994).

The first three *Leon* factors are not in play; the only question is

whether Marcantel and Hix could have "harbored an objectively reasonable

belief in the existence of probable cause." *Leon,* 468 U.S. at 926.  The

answer is yes.  At most it is debatable whether the warrant should have

issued.  Surely this is not a case where the officers "should not have applied

for the warrant." *Malley*, 475 U.S. at 345. While not conclusive evidence of the officers' reasonable belief, a law trained judge found the affidavit sufficient to establish probable cause and issued the warrant. Moreover the officers also consulted counsel with respect to the adequacy of the affidavit before it was presented to the judge.[6] In such circumstances the threshold over which the officers must pass to avoid suppression of evidence in a criminal case or to be entitled to qualified immunity in a civil case is quite low.

This circuit has applied a different rubric to the "bare bones" affidavit mentioned in *Leon*. Under our case law if a search warrant was erroneously issued, we nevertheless uphold the search if there is a <u>minimal</u> nexus between the place searched and the suspected criminal activity or evidence. *United States v. Gonzales*, 399 F.3d 1225, 1231 (10th Cir. 2005). "[T]here must be *some* factual basis connecting the place to be searched to the

---

[6] In *United States v. Otero*, we observed:

Inspector Herman did not stop at her own understanding of the warrant, but sought the assistance of the Assistant United States Attorney, who ensured her that it satisfied the legal requirements.
. . . .
The fact that Inspector Herman . . . made this step is an important indicator of her good faith. If more officers took such precautions we would have greater rather than less protection of Fourth Amendment rights.

No. 08-2154, 2009 WL 1119657, at *6, 7 (10th Cir. Apr. 28, 2009).

- 13 -

defendant or suspected criminal activity.  When this connection is wholly absent, the affidavit and resulting warrant are so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (quotations omitted).  The affidavit in this case certainly satisfies the reasonable nexus (or "bare bones") test.  As explained above, the affidavit provides detailed facts connecting Astorga to Marcella, connecting Marcella to the Poolaw property on the very night Astorga went on the run, and demonstrating unusual, even suspicious, behavior by Marcella.  Common sense supplies the motive for Astorga to contact Marcella and for her to assist him.  The affidavit also establishes an opportunity for Marcella to have contacted Astorga (during the early morning hours of March 22 and later that day when her whereabouts were suspiciously unknown from early morning until 1:30 p.m.)  Moreover, it is not an unwarranted leap of logic to assume Marcella could have contacted Astorga between March 22 and March 24 (the date of the affidavit) or to embrace the possibility that Marcella returned to her parents' property after she had contact with Astorga.

"Just as reviewing courts give 'great deference' to the decisions of judicial officers who make probable-cause determinations, police officers should be entitled to rely upon the probable-cause determination of a neutral magistrate when defending an attack on their good faith for either seeking or

executing a warrant." *United States v. Corral-Corral*, 899 F.2d 927, 939 (10th Cir. 1990); *see also Malley*, 475 U.S. at 346 n.9 ("It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination, and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable.") (citation and quotations omitted). "This is particularly true, where, as here, with the benefit of hindsight and thoughtful reflection, reviewing judges still cannot agree on the sufficiency of the affidavit." *Corral-Corral*, 899 F.2d at 939; *see also Arnsberg*, 757 F.2d at 981 (granting qualified immunity to officers for invalid arrest warrant where reasonable officers could disagree with court's probable cause assessment: "It would be plainly unreasonable to rule that the arresting officers . . . must take issue with the considered judgment of . . . the federal magistrate. [Such a rule] would . . . mean that lay officers must at their own risk second-guess the legal assessments of trained lawyers. The Constitution does not require that allocation of law enforcement duties."). "If judges . . . disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson*, 526 U.S. at 618.

If the search was erroneously authorized the consequences of the error

- 15 -

ought not be visited on Marcantel and Hix, who followed proper procedure in obtaining the warrant, which, in turn, was executed in good faith by other officers. *Leon*, 468 U.S. at 921 ("Once [a] warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law. Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.") (citation and quotations omitted).

B.  Clearly Established Law

Assuming, *arguendo*, a constitutional violation occurred, Marcantel and Hix are entitled to qualified immunity because the law at the time of the search did not fairly warn their conduct was unlawful. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (for the law to be clearly established, the law at the time of the incident must have provided the law enforcement officers with "fair warning" that their conduct was unconstitutional). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).

Conducting a de novo review of the affidavit the majority has concluded it does not supply probable cause to search (actually the majority

- 16 -

must be saying no reasonable officer or judge would think the affidavit was sufficient).  To justify that conclusion it says: 1) the law requires "more" than a showing of a family relationship to establish probable cause and 2) the "more" required was insufficient in this case because it consisted of piling inference upon inference, a practice forbidden by our case law.  With all due respect, I think the majority has lost focus.  The piling of inference upon inference, if it occurred, was judge error, not officer error.  And the "more" required, to the extent it finds expression in our cases or in common sense, has been met by reasonable inferences drawn from facts recited in the affidavit.  Our concern should center on whether the officers violated clearly established law in seeking the warrant, not whether the affidavit is ultimately satisfying to this Court.

The concern about piling inference upon inference must go to the possible risk of misleading the judge asked to issue the warrant.  But clearly established law restricts officers from intentionally misleading the judge with respect to the facts.  *See Franks v. Delaware*, 438 U.S. 154, 164-65 (1978) ("When the Fourth Amendment demands a factual showing sufficient to comprise probable cause, the obvious assumption is that there will be a *truthful* showing . . . .") (quotations omitted); *see also Leon*, 468 U.S. at 923 (good faith exception to exclusionary rule inapplicable "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the

affiant knew was false or would have known was false except for his reckless disregard of the truth"). The magistrate cannot do an independent investigation but must rely on the facts presented by the affiant. *Franks*, 438 U.S. at 169 (recognizing that due to their urgency and ex parte nature, the proceedings before the magistrate often do not allow the magistrate to make an extended independent examination of the affiant or other witnesses). Marcantel and Hix acted with objective good faith;[7] in fact the affidavit contains information about the cooperation extended by Rick and Marcella, providing contextual reference for the judge. Admittedly, the affidavit urged the issuing judge to draw unwarranted inferences from the facts. The majority regards that attempt as fatal. I cannot agree and some detail is necessary to explain why.

The affidavit parenthetically suggests Marcella's presence at the Poolaw residence on the night of the McGrane murder indicates she resides there at least part time. The affidavit then asserts because Marcella lives at the Poolaw residence part time, "it would be reasonable to assume" Astorga lives there at least part time as well. (R. App. at 67.) Finally, the affidavit asserts it would be "reasonable to assume" Astorga may have secreted

---

[7] *Franks*, 438 U.S. at 164-65 (stating the Fourth Amendment's Warrant Clause "takes the affiant's good faith as its premise"; the requirement that there be a truthful showing of the facts does not mean every fact in the affidavit must necessarily be correct but rather "that the information put forth is believed or appropriately accepted by the affiant as true").

- 18 -

himself or evidence within the structures on the property because the
Poolaws are Astorga's in-laws.  (*Id.*)  The inferences urged upon the judge
were overbroad but that is legally insignificant.

The inferences to be drawn from the facts are the sole prerogative of
the magistrate and we can assume the judge here drew his own conclusions
regardless of what the affiant may have urged, particularly when the
inferences (assumptions, in the affiant's words) are clearly labeled as such.
*See Johnson v. United States*, 333 U.S. 10, 13-14 (1948) ("The point of the
Fourth Amendment, which often is not grasped by zealous officers, is not
that it denies law enforcement the support of the usual inferences which
reasonable men draw from evidence.  Its protection consists in requiring
that those inferences be drawn by a neutral and detached magistrate instead
of being judged by the officer engaged in the often competitive enterprise of
ferreting out crime.").

In any event the problem is easily solved by simply ignoring the
affiant's urging.  *Cf. United States v. Myers*, 106 F.3d 936, 939-40 (10th
Cir. 1997) (concluding it need not decide whether certain information
contained in the warrant and affidavit was fabricated where the affidavit
established probable cause even without the information); *Taylor v.
Meecham*, 82 F.3d 1556, 1562 (10th Cir. 1996) ("If an arrest warrant
affidavit contains false statements, the existence of probable cause is

determined by setting aside the false information and reviewing the remaining contents of the affidavit.") (quotations omitted). If the inferences urged upon the issuing judge are eliminated or ignored and reasonable inferences substituted in their place, a finding of probable cause is still justified (at the very least, fairly debatable).

Marcantel and Hix's conduct in urging the judge to draw inferences, clearly labeled as inferences, does not violate clearly established law of which I am aware even if the urging was unwarranted. Neither the parties nor the majority have cited authority for such a proposition.

Whether the judge erred in concluding the <u>facts</u> contained in the affidavit and inferences to be drawn from those facts established probable cause is another matter, but not one for which these officers or the officers executing the warrant should be held to account, unless these officers intentionally misled the issuing magistrate with respect to the facts. *Malley*, 475 U.S. at 345; *Leon*, 468 U.S. at 922-23.

The law encourages, generally demands, officers obtain a warrant before conducting a search, especially of a home. *See Payton v. New York*, 445 U.S. 573, 586 (1980) ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.") (quotations omitted); *Franks*, 438 U.S. at 164 ("The bulwark of Fourth Amendment protection, of course, is the

Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search." ). Courts reward officers who obtain warrants. *See Ventresca*, 380 U.S. at 106 ("[I]n a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall."). That reward may be most unsatisfying for officers who followed proper procedure and exhibited objective good faith in obtaining a search warrant only to find themselves being forced to trial in a civil suit for damages because a judge may have erred in issuing the warrant.

The focus on Poolaw family ties is central to the majority's concern about the sufficiency of the search affidavit. It underlies the problem it sees in piling inferences on inferences. Discussed *supra* at 15-16. I agree a familial relationship with one suspected of criminal activity, without more, is insufficient to establish probable cause. *See Vazquez-Pulido*, 155 F.3d at 1216; *c.f. Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). But there is more in this case; enough more, in my view, to establish probable cause. The majority disagrees, demanding a whole lot more. There is no clearly established law explicitly saying how an officer seeking to obtain a warrant is supposed to know how much "more" than a familial relationship is required. And that is the issue to which clearly established law must speak. Because probable cause is so fact dependent, generalized statements of the

law do little to inform the debate in a meaningful way. *See Brosseau v. Haugen*, 543 U.S. 194, 199-201 (2004). If the law is clearly established officers should be able to find clarity at the headwaters of the "without more" test, *Vazquez-Pulido*, 155 F.3d at 1216-17. We need to look.

In *Vazquez-Pulido* the defendant's brother, Javier, was arrested at a port of entry on the Mexican border in a car containing illegal drugs. Javier said the car belonged to the defendant, Jose, and another individual. That same day at the same port of entry Jose applied to replace a permanent resident alien card. An immigration clerk noticed Jose's application contained personal information nearly identical to that of Javier, whose arrest paperwork he had processed earlier in the day. The clerk reported the similarities to customs officials who arrested Jose on drug charges. At a suppression hearing Jose claimed his arrest was unlawful because his familial relationship with Javier and his arrival at the port of entry shortly after Javier was arrested were insufficient to establish probable cause. We said: "[W]here there are facts in addition to one's association with someone engaged in criminal activity, as in this case, we must consider whether the totality of the circumstances known at the time of the arrest established probable cause." *Id*. (quotations omitted). The agents knew: 1) Javier was arrested at the port of entry after drugs were found in the car he was driving; 2) Jose appeared at the port of entry shortly thereafter on foot and without

- 22 -

luggage; 3) immigration documents indicated Javier and Jose were brothers; and 4) Javier had said the car belonged to his brother and another person. The "more" in the totality of the circumstances wasn't much more than a familial relationship—proximity to the crime and Javier's statement, which might have been incriminating as to Jose (the <u>car</u> belongs to my brother and another person; there was no direct connection between Jose and the drugs). It was permissible for the customs officer to infer that Jose was participating in the transportation of the drugs simply because he was part owner of the car and was at the border at approximately the time his brother Javier passed through with the car. So what lesson should officers take from the case? The clearly established law is that not much more than family ties is required for probable cause—a couple of tangential facts and reasonable inferences.

Reasoning from *Vazquez-Pulido* and considering the totality of the circumstances, Marcantel and Hix could comfortably believe the facts they had, aided by reasonable inferences, were adequate. They had considerably more than mere propinquity and more than family ties. And clearly established law did not foreclose their conclusion. Certainly it could not have led them to believe their evidence was so thin they should not have even attempted to obtain a warrant. *See Malley*, 475 U.S. at 345 (an officer is entitled to qualified immunity unless a reasonably well-trained officer in

the officer's position "would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant").

We should be more deferential to officers' judgment calls when the governing rule is cast at a high level of abstraction, as here—deciding whether the facts are sufficient to <u>apply</u> for a search warrant.[8]  The majority affords no deference, choosing instead to substitute its own sensibilities. That is not the law.  "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."  *Pearson*, 129 S. Ct. at 823.

In any event, the test is not whether the officers were incorrect in their assessment of probable cause or whether the judge was wrong to issue the warrant.  It is whether the officers' request and the judge's response were

---

[8] In a related context (deference due to state courts under 28 U.S.C. § 2254(d)(1)) the Supreme Court recently said:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro, supra*, at 473, 127 S. Ct. 1933.  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. *See Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

*Knowles v. Mirzayance,* –U.S.–, 129 S. Ct. 1411, 1420 (2009).

reasonable. Even if the officers were mistaken, their mistake was reasonable. The protection of qualified immunity extends to such reasonable mistakes, whether they are ones of law, fact or a combination thereof. *Id.* at 815; *see also Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct . . . . If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense."), *overruled on other grounds by Pearson v. Callahan*, 129 S. Ct. 808 (2009); *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007) (en banc) ("[L]aw enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity.").

## II.  SEIZURE OF RICK AND CINDY POOLAW

A.  Constitutional Violation

In addition to other claims the Poolaws brought an excessive force claim against Marcantel and Hix (who were not present when the search warrant was executed) which they voluntarily dismissed. The only remaining issue is the constitutionality of Rick and Cindy Poolaws' seizure incidental to the search.

Because the search of the Poolaw property was constitutionally reasonable, the seizure of Rick and Cindy during that search was also

reasonable. *See Michigan v. Summers*, 452 U.S. 692, 705 (1981) ("[F]or

Fourth Amendment purposes, we hold that a warrant to search for

contraband founded on probable cause implicitly carries with it the limited

authority to detain the occupants of the premises while a proper search is

conducted."); *see also Muehler v. Mena*, 544 U.S. 93, 98 (2005) ("Mena's

detention for the duration of the search was reasonable under *Summers*

because a warrant existed to search 1363 Patricia Avenue and she was an

occupant of that address at the time of the search.").  Whether or not these

officers knew or should have known the Poolaws would be seized incident to

the search is immaterial because their seizure was lawful.  There was no

constitutional violation.

B.  Jurisdiction

The district court denied qualified immunity to these officers.  It also

concluded "any detention at all [of the Poolaws] was *ipso facto*

unreasonable" because the search was unconstitutional and so entered

summary judgment against the officers on the Poolaws' seizure claim (as to

liability only).  (R. App. at 326 n.7.)  The officers appealed from both

rulings.

The majority refuses to address the summary judgment entered in

favor of the Poolaws on the seizure issue, concluding we lack jurisdiction to

consider it: "We note that in this interlocutory appeal, the court has

jurisdiction solely to review the issues of law raised by the denial of qualified immunity to Marcantel and Hix. *Mitchell*, 472 U.S. at 530. . . . However, qualified immunity is immunity to <u>suit</u>, not a defense to <u>liability</u>. *Id.* at 526." (Majority Op. at 20 n.11.) That strikes me as incorrect.

The complete quote from *Mitchell v. Forsyth* is this: "The entitlement [to qualified immunity] is an immunity from suit rather than a *mere* defense to liability . . . ." 472 U.S. 511, 526 (1985) (emphasis added). "[I]t is effectively lost if [the] case is erroneously permitted to go to trial." *Id.* The summary judgment entered in favor of the Poolaws and against the officers (finding them liable) deprives them of a "defense to liability" *Id.* They are entitled to interlocutory review of that decision. Refusing to consider that appeal also improperly runs the risk of forcing them to trial twice, contrary to the intent and purpose of qualified immunity.

These officers must now face a trial on damages where they will be foreclosed from presenting evidence or argument on liability. When that trial is concluded and the officers appeal we will reverse because the summary judgment on liability was improvidently granted—genuine issues of material fact exist as to liability (as I explain *infra* at 27-28). The issue will then return to the district court for a trial on liability and damages. The officers will unnecessarily face two trials.[9] This is a needless and wasteful

---

[9] Of course the argument could be made that my concern about
(continued...)

exercise.  If the trial judge entered summary judgment in error we should correct it now.  If he was correct we should affirm.  Deciding, rather than avoiding, the issue saves time, expense and aggravation for all parties and all courts.  The matter should be approached in a practical way, which is the justification for pendent appellate jurisdiction.

We have pendent appellate jurisdiction over the partial grant of the Poolaws' motion for summary judgment; the record is adequate to decide the issue and the summary judgment is inextricably intertwined with the denial of the officers' motion for partial summary judgment based on qualified immunity.  *See Swint v. Chambers County Comm'n*, 514 U.S. 35, 50-51 (1995); *Moore v. City of Wynnewood*, 57 F.3d 924, 928-29 (10th Cir. 1995).  Pendent appellate jurisdiction has been embraced in a number of other qualified immunity cases.  *Brennan v. Twp. of Northville*, 78 F.3d 1152, 1157-58 (6th Cir. 1996) (exercising pendent appellate jurisdiction over the grant of summary judgment to the plaintiff because inextricably intertwined with defendants' appeal from the denial of qualified immunity; "[t]his case . . . presents a situation in which the holding on qualified immunity—that

---

<sup>9</sup>(...continued)
multiple trials is speculative because intervening events (no damages awarded) might make the issue moot. But that can always be said and if such reasoning were evenly applied there would be no need for interlocutory appeals because there is always the possibility officers might win on the merits even though they were improperly denied qualified immunity before trial.

plaintiff has failed to raise a constitutional claim—has *everything* to do with the merits of the summary judgment in favor of plaintiff: without a constitutional claim, the judgment for [the plaintiff] simply cannot stand against [the defendants]); *see also Walczyk v. Rio*, 496 F.3d 139, 153 (2d Cir. 2007) (exercising pendent appellate jurisdiction over plaintiff's appeal from the denial of summary judgment as to defendants' liability on her unlawful search claim because it is inextricably intertwined with defendants' appeal from their denial of qualified immunity on that claim); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 549-51 (6th Cir. 2002) (exercising pendent appellate jurisdiction over the grant of partial summary judgment to the plaintiffs on the issue of Fourth Amendment liability where in reviewing the qualified immunity issue court had determined the agreed upon facts demonstrated the officer had violated the plaintiffs' Fourth Amendment rights); *Luna v. Pico*, 356 F.3d 481, 486-87 (2d Cir. 2004) (exercising pendent appellate jurisdiction over denial of plaintiff's motion for summary judgment as to defendants' liability on his due process claim because inextricably intertwined with defendants' appeal from their denial of qualified immunity on that claim); *Hudson v. Hall,* 231 F.3d 1289, 1293-94 (11th Cir. 2000) (exercising pendent appellate jurisdiction over plaintiffs' cross-appeal challenging partial grant of qualified immunity to defendant on initial stop and search of plaintiffs'

vehicle because inextricably intertwined with defendant's appeal challenging denial of qualified immunity on search of plaintiffs' persons); *Marks v. Clarke*, 102 F.3d 1012, 1018 (9th Cir. 1996) (exercising pendent appellate jurisdiction over grant of partial summary judgment to the plaintiffs on liability as to search because inextricably intertwined with denial of qualified immunity to defendants on search claim).

   With respect to the merits I conclude, as previously discussed, no constitutional violation occurred. Had an unconstitutional search occurred, the proper inquiry is whether the officers (who were not present) knew or reasonably should have known their actions would cause the seizure. *See Buck v. City of Albuquerque*, 549 F.3d 1269, 1279 (10th Cir. 2008). That is a fact intensive inquiry which cannot be foreclosed simply because the officers instigated the search and department procedures call for a limited seizure incident to every search (if that is, in fact, the policy). The burden of proof in a qualified immunity case does not shift—it is the Poolaws' burden. And since the officers were resisting the Poolaws' summary judgment motion (as well as asserting their own summary judgment motion) all inferences must be drawn in favor of them with respect to the Poolaws' motion. We should reverse the summary judgment and remand for a trial on liability, as well as damages, and see if a jury would actually "find Marcantel and Hix knew or reasonably should have known the Poolaws

would be seized incident to the search." (Majority Op. at 20.)

## III. STOP OF CHARA

As part of their investigation of the McGrane murder, law enforcement officers obtained a court-ordered wiretap of Cindy Poolaw's telephone. Officers intercepted a call between Cindy and Chara Poolaw in which Chara asked Cindy if she could "get in trouble" for having a gun in her car. (R. App. at 146.) Marcantel learned about the intercepted telephone call and ordered the stop of Chara's vehicle. He did so based on: 1) the intercepted call, 2) the missing murder weapon (a 10 millimeter handgun), 3) Chara's relationship to Astorga—sister-in-law and 4) Astorga's status as a fugitive and prime murder suspect. The stop was performed by the New Mexico Department of Public Safety's Special Investigations Division (NMDPSSID). At the time of the stop, Chara had just arrived at her workplace after getting lunch. The officers detained Chara and obtained her consent to search her vehicle. They found a gun in her vehicle. Once the gun was cleared as unrelated to the McGrane murder, Chara was released.[10]

_____

[10] The NMDPSSID officers who stopped Chara approached her with their guns drawn, handcuffed her for allegedly "an hour or more" and placed her in the back of a patrol vehicle. (R. App. at 89.) Her vehicle was searched pursuant to her written consent. Although the Poolaws' complaint did not contain an unlawful search claim based on the search of Chara's vehicle, in their motion for partial summary judgment, they argued the search was unconstitutional because it was done without a warrant and Chara's written consent to the search was not voluntary but rather the product of coercion. Specifically, they alleged the officer who obtained

(continued...)

The only issue on appeal is whether the <u>stop</u> violated Chara's

constitutional rights.  Marcantel ordered Chara's stop to investigate whether

she was concealing the McGrane murder weapon.  Such police-citizen

encounters are investigatory stops.  *See Cortez*, 478 F.3d at 1115

(identifying the three types of police-citizen encounters: consensual

encounters, investigatory stops and arrests).  To determine whether an

investigatory stop is based on reasonable suspicion of criminal activity, we

look to the totality of the circumstances to see whether the officer had "a

particularized and objective basis for suspecting the particular person

stopped of criminal activity."  *United States v. Sanchez*, 519 F.3d 1208,

---

(...continued)

Chara's consent gave her the option of either waiting for a search warrant, which would take time, or signing the consent form and being released.  In response to the Poolaws' motion, Marcantel claimed there was probable cause to search the vehicle and Chara voluntarily consented to the search. However, in his own motion for partial summary judgment, Marcantel specifically said he was not seeking summary judgment on the claim that Chara's vehicle was unlawfully searched because there was a factual dispute concerning the voluntariness of her consent.  The voluntariness of Chara's consent was also identified as a contested issue in the pretrial order.  In its discussion of the stop and search of Chara's vehicle, the district court concluded Marcantel did not have reasonable suspicion to stop Chara's vehicle.  Because there was no reasonable suspicion, the court rejected Marcantel's claim of qualified immunity as to both the stop and search of Chara's vehicle.  However, in its conclusion, the court did not mention the search of Chara's vehicle, stating only, "there was no constitutional basis for either the search warrant authorizing the search of the Poolaws' residence and property, or for the stop of Chara's vehicle." (R. App. at 330.)  Marcantel does not appeal from the district court's conclusion that he is not entitled to qualified immunity for the search of Chara's vehicle. Therefore, I will not address it.

1213 (10th Cir. 2008) (quotations omitted); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002). "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274 (citations and quotations omitted).

While it may be legal to carry a gun in a vehicle in New Mexico, it certainly is not legal to conceal the fruits of a crime. *See* N.M. Stat. Ann. §§ 30-22-4 ("Harboring or aiding a felon consists of any person, not standing in the relation of husband or wife, parent or grandparent, child or grandchild, brother or sister by consanguinity or affinity, who knowingly conceals any offender or gives such offender any other aid, knowing that he has committed a felony, with the intent that he escape or avoid arrest, trial, conviction or punishment."); 30-22-5 ("Tampering with evidence consists of destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another."). A reasonable officer could logically infer from Chara's comment to her mother that the gun Chara had was no "ordinary" gun. *See Arvizu*, 534 U.S. at 273 ("[Reasonable suspicion] allows officers to draw on their own experience and specialized training to make inferences from and deductions

about the cumulative information available to them that might well elude an untrained person.") (quotations omitted). "[We] must defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. Karam*, 496 F.3d 1157, 1162 (10th Cir. 2007) (quotations omitted). "Reasonable suspicion requires a dose of reasonableness and simply does not require an officer to rule out every possible lawful explanation for suspicious circumstances before effecting a brief stop to investigate further." *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1208 (10th Cir. 2007), *cert. denied*, 128 S. Ct. 933 (2008).

The facts known to Marcantel supplied reasonable suspicion to stop Chara in order to investigate further. Whether the duration or intensity of the seizure of Chara was excessive is not before us. Neither is the voluntariness of her consent to search her vehicle.

## IV. CONCLUSION

I would reverse the district court and extend qualified immunity to Marcantel and Hix on the unlawful search and unlawful seizure claims made by Rick and Cindy Poolaw. In the alternative I would reverse the grant of summary judgment to the Poolaws on the seizure claim and remand for trial on the issue of liability as well as damages. I would also reverse and extend qualified immunity on the claim that the stop of Chara violated her constitutional rights.